## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

CHRISTOPHER KOHLS and MARY
FRANSON,

*Plaintiffs*,

v.

KEITH ELLISON, in his official capacity
as Attorney General of Minnesota, and
CHAD LARSON, in his official capacity
as County Attorney of Douglas County,

*Defendants*.

Civil Action No. 0:24-cv-3754- ECT-DLM

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR A PRELIMINARY INJUNCTION —
## EXPEDITED CONSIDERATION REQUESTED

Imagine a *Saturday Night Live* sketch. It starts with a "cold open," showing a facsimile title card and other visual trappings from a news show, C-SPAN broadcast, debate, or advertisement. Actors, in makeup and doing their best impersonations, skewer the mannerisms of politicians, espousing over-the-top caricatures of their foibles and political positions.

This sort of production is now illegal—criminal!—in Minnesota, when producers use artificial intelligence (AI) tools to execute their spoof.

Americans have freely satirized politicians—using hyperbole, imitation, gesticulation, and parody, amongst other means—since before this country was founded. State crackdowns on AI-generated content within this tradition—like the law at issue in this case—violate the First Amendment and should be enjoined.

Plaintiff Christopher Kohls is a political content creator who has found limited fame and steady income creating videos that poke fun at politicians he opposes politically, including Vice President Kamala Harris, the Democratic nominee for President. Kohls posts parody videos to his accounts on YouTube and X (formerly known as Twitter), where viewers can watch satires of "Harris" announcing outrageous policies and arguments for her candidacy (in an AI-generated voice) in the aesthetic of a political campaign ads. Separately, Plaintiff Mary Franson—a Minnesota State Legislator—has shared memes and satire, including AI-generated content on X, to communicate politically with her constituents and others around the State. She has shared one of Kohls's Harris videos on her own X account, along with other absurdist or satirical AI-generated election-related content—and wants to continue doing so in the future.

Kohls's first Harris video, posted on July 26, 2024, went viral: Elon Musk shared the video and commented that "This is amazing 🤣," leading to more than one hundred million views. Complaint ¶ 8. Minnesota's Senator Amy Klobuchar

was not so supportive, tweeting that the video was a violation of "X's own rules" which bans "media that is significantly and deceptively altered, manipulated or fabricated" or "likely to result in widespread confusion on public issues." *Id.* ¶ 75. California Governor Gavin Newsom went further, commenting that "Manipulating a voice in an 'ad' like this one should be illegal. I'll be signing a bill in a matter of weeks to make sure it is." Complaint ¶ 8. Newsom and the California Legislature followed through on this threat, passing two bills to make Kohls's video illegal. Kohls separately challenges those laws in California federal court, which granted him a preliminary injunction against AB 2839 last week. *See Kohls v. Bonta*, No. 2:24-cv-02527 JAM-CKD, 2024 WL 4374134, 2024 U.S. Dist. LEXIS 179933 (E.D. Cal. Oct. 2, 2024). "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary' and Courts must ensure that speech, especially political or electoral speech, is not censored for its ideas, subject matter, or content." *Id.* at *24-*25 (quoting *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011)).

This Court should reach the same conclusion with Minn. Stat. § 609.771, which is even more sweeping and punitive than the statute enjoined in *Kohls*. Section 609.771 proscribes the mere "dissemination" of AI-generated election-related videos and memes that "influence an election." Unlike the California laws,

which provide for only equitable and injunctive relief, § 609.771 also carries criminal penalties and—for candidates like Franson—a conviction results in *forfeiture of their election* and permanent ineligibility for future state office.

The Supreme Court has clarified that alleged misinformation in the eyes of the state—oftentimes mere political commentary to the public (and sometimes nevertheless truthful)—is fully protected speech unless it causes a "legally cognizable harm" to the interests of another, which is not the case with Plaintiffs' memes and videos. *United States v. Alvarez*, 567 U.S. 709, 719 (2012); *see generally* Eugene Volokh, *When are Lies Constitutionally Protected*, 4 J. FREE SPEECH L. 685 (2024).[1] Laws targeting political deepfakes "implicate[] none of the legally cognizable harms recognized by *Alvarez* and thereby unconstitutionally suppress[] broader areas of false but protected speech." *Kohls*, 2024 U.S. Dist. LEXIS 179933, at *11. Indeed, "[t]he political context is one such setting that would especially 'perilous' for the government to be an arbiter of truth in." *Id.* at *15. This Circuit has recognized the same. *281 Care Comm. v. Arneson*, 766 F.3d 774, 784-87 (8th Cir. 2014).

---

[1] Available at: https://www.journaloffreespeechlaw.org/volokh5.pdf.

Strict scrutiny applies to restrictions of speech based on content, and § 609.771 cannot survive such scrutiny; it criminalizes protected speech, and does so using vague and overbroad terms. The fear of digitally-assisted fakes "does not give legislators unbridled license to bulldoze over the longstanding tradition of critique, parody, and satire protected by the First Amendment." *Kohls*, 2024 U.S. Dist. LEXIS 179933, at *14.

Accordingly, the Court should grant Plaintiffs' request for preliminary injunction on an expedited basis.

## STATEMENT OF FACTS

Plaintiff Mary Franson is a Minnesota State Representative from District 12B. She has mastered the art of using social media—and especially her personal X account (@RepMaryFranson)—to communicate with her constituents and political supporters throughout the country, often using memes. Memes are graphics and videos with absurdist or humorous annotations which convey a political message. Many memes today—including those shared by Representative Franson—are generated by artificial intelligence (AI), meaning the imagery or sound appears real but it is actually produced by an algorithm. Political commentators find memes especially effective for mocking politicians and spreading political messages. For example, on September 16, Rep. Franson

retweeted a response to an image by the Babylon Bee, a satire account, captioned "Oh No! Tim Walz Just Waved So Hard His Arms Flew Off!" Complaint ¶ 5. The accompanying image features the likeness of Gov. Walz at a political rally, except his forearms have flown off their bones. *Id*. As an evidently more controversial example, on July 27, Rep. Franson retweeted X's owner, Elon Musk, who posted a video in the style of a campaign ad for Vice President Kamala Harris with the comment "This is amazing 😂." *Id*. A voice that sounds like Kamala Harris narrates the "ad," and it says outlandish things like "Joe taught me rule number one: carefully hide your total incompetence." In fact, Harris never said this. The voiceover was generated to create a parody lampooning the candidate's political weaknesses. *Id*.

The creator of the Harris video that Franson shared is Plaintiff Christopher Kohls, who posts AI-generated content on both YouTube and X using the moniker "Mr Reagan USA." He has roughly 120,000 followers on X and 380,000 subscribers on YouTube who automatically receive his content, including in Minnesota.

Commentators have found the July 26 video deceptive. For example, news organizations issued "fact-checks" for the video, explaining that Kamala Harris did not actually speak the narration of the parody. *Id*. ¶ 73. Rob Weissman, co-president of the advocacy group Public Citizen opined that "most people" would

be deceived by the video. "I'm certain that most people looking at it don't assume it's a joke…precisely because it feeds into preexisting themes that have circulated around her, *most* people will believe it to be real." *Id.* ¶ 74 (emphasis added). U.S. Senator Amy Klobuchar echoed this sentiment, tweeting about the July 26 video posted by Musk: "If @elonmusk and X let this go and don't label it as altered AI content, they will not only be violating X's own rules, they'll be unleashing an entire election season of fake AI voice and image-altered content with no limits, regardless of party." *Id.* ¶ 75. Sen. Klobuchar attached a link to a news story suggesting that Musk's tweet of the July 26 video violated X's policy on synthetic and manipulated media. That policy resembles § 609.771 because it applies to "misleading media" which includes "media that is significantly and deceptively altered, manipulated or fabricated" or "likely to result in widespread confusion on public issues." Complaint ¶ 75.

California Governor Gavin Newsom responded on X that "Manipulating a voice in an 'ad' like this one should be illegal. I'll be signing a bill in a matter of weeks to make sure it is." Newsom did just that, approving two bills passed by implicating Kohls's content; Kohls is separately challenging those laws in the Eastern District of California. Newsom responded to Kohls's suit by characterizing the video as a "misleading deepfake in the middle of an election." Complaint ¶ 72.

The district court granted Kohls's motion to enjoin California officials from enforcing California's AB 2839, which it found "acts as a hammer instead of a scalpel, serving as a blunt tool that hinders humorous expression and unconstitutionally stifles the free and unfettered exchange of ideas which is so vital to American democratic debate." *Kohls*, No. 2:24-cv-02527 JAM-CKD, 2024 U.S. Dist. LEXIS 179933, at *24.[2]

Unfortunately for Rep. Franson, perhaps the most egregious crackdown on AI-generated political memes comes exists in Minnesota. Under Minn. Stat. § 609.771, the State attaches criminal penalties and—for political candidates— electoral forfeiture and disqualification for the mere *dissemination* of certain AI-generated political content that "influence[s] an election." Plaintiffs bring this suit to challenge that statute.

Section 609.771 was originally passed in 2023 sandwiched in a near-unanimous legislative package, HF 1370, aimed at deterring tortious AI-generated revenge porn. The original bill criminalized the "dissemina[tion]"—not only the creation—of a "deep fake" so long as it was (1) within "90 days before an election"; (2) created without a candidate's consent; and (3) "made with the intent to injure

---

[2] The other California bill does not become effective until January 1, 2025, so was not subject of Kohls's motion.

a candidate or influence the result of an election." Minn. Stat. § 609.771 subd. 2 (2023).[3] In addition, the law carried criminal penalties—including jail time and fines—and authorized the speaker's political adversaries to sue for injunctive relief. § 609.771 subd. 3 & 4. Despite the original bill's plain constitutional flaws, Franson voted for it—she could not, as an ardent supporter of women, vote against the cumulative legislation up for vote when it provided substantial revenge porn protections. Complaint ¶ 54.

Nevertheless, in 2024 Minnesota legislators aligned with the Democratic-Farmer-Labor Party decided to revise § 609.771 in a way that uniquely harms Plaintiff Franson. This revised bill, HF 4772, passed largely on party lines: In addition to the existing criminal penalties, the amended § 609.771 requires courts to declare that any state or local candidate found to have disseminated an AI-generated "deep fake" in violation of the statute has forfeited her election. Minn. Stat. § 609.771 subd. 3(b). Further, that candidate is disqualified from running for state or local office again in Minnesota. *Id.* subd. 3(c). The amended statute also

---

[3] A "deep fake" is video, image, or photograph that (1) "is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct"; and, (2) "the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." Minn. Stat. § 609.771 subd. 1(c).

added the possibility of "equitable," in addition to "injunctive," relief (*id*. subd. 4), and it expands § 609.771's temporal reach to AI-generated videos made "within 90 days before a political party nominating convention" or, "after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election." *Id.* subd. 2(a)(3). Finally, the bill changed the *mens rea* required for liability to "knowing[ly]" or with "reckless disregard," Minn. Stat. § 609.771 subd. 2(a), rather than the "knows or reasonably should know" standard originally enacted. This change is irrelevant to both Plaintiffs, who have disseminated and wish to continue disseminating AI-generated election content knowingly. Complaint ¶ 35. Franson voted against HF 4772. *Id.* ¶ 60.

The amended § 609.771 went into effect on July 1, 2024, meaning all of Kohls's Harris videos and plenty of Franson's tweets—including her retweet of the July 26 video—fall within the scope of the law. Defendants remain charged with enforcing the law, either through its criminal penalties or civil injunctive and equitable relief.

Section 609.771 puts both Plaintiffs in the crosshairs for their dissemination of AI-generated election content in Minnesota. And because of the law, both Plaintiffs are irreparably harmed: Kohls's creation of Harris videos and Franson's

regular use of X to share conservative memes—including Kohls's—means both Plaintiffs are open to criminal liability for their acts. Kohls's videos are at risk of being taken down under § 609.771's injunctive penalties, as are Franson's retweets. For Kohls—who makes a living by monetizing his videos—his livelihood is materially impacted. And so is Franson's eligibility as a political candidate and state representative, because of § 609.771's prohibition on holding political office for candidates convicted of disseminating AI-generated election-related content. The law will also deter similar content from being generated and shared by others—some of which Kohls and Franson want to consume and share. Most importantly, because it opens speakers to criminal and other liability, § 609.771 chills both Plaintiffs' ability to share their own political message.

Accordingly, they bring suit together to enjoin § 609.771's enforcement.

## LEGAL STANDARD

Four factors determine whether injunctive relief is warranted: (1) whether the plaintiff is likely to succeed in the litigation; (2) whether the plaintiff will suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the public interest in an injunction. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). In the context of a First Amendment claim, the test generally turns on the first factor, which is "the most important." *Jones v. Jegley*, 947 F.3d 1100, 1105 (8th Cir.

11

2020). Where plaintiffs have "established that the law likely violates the First Amendment," the three remaining factors are generally satisfied as well. *Rodgers*, 942 F.3d at 457 (internal citation omitted); *accord Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (similar). Likewise, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 120 (D. Minn. 2021)).

To determine whether a First Amendment plaintiff can demonstrate a likelihood of success, the plaintiff must make a colorable claim that she seeks to engage in protected activity, at which point the burden shifts to the state to "establish" that the speech restriction satisfies the relevant standard of scrutiny. *Rodgers*, 942 F.3d at 456; *accord Jones*, 947 F.3d at 1105-06 (affirming conclusion of probable success). Because the speech at issue is political commentary—and thus "occupies the core of the protection offered by the First Amendment"—strict scrutiny applies to any state justification. *281 Care Comm.*, 766 F.3d at 784. This means the state bears the burden to demonstrate that the law "is narrowly tailored to meet a compelling government interest." *Id.* at 785. Among other things, it must show that the law is the "least restrictive alternative" for advancing its interests. *Id.* at 789, 793-94; *Kohls*, 2024 U.S. Dist. LEXIS 179933, at *13-*15 (holding that California's political deepfake law failed this requirement).

Finally, because of "the haste that is often necessary" to prevent irreparable injury, preliminary injunction "procedures" are "customarily" "less formal" and "evidence" "less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A court may rely on the verified complaint's averments or other affidavits as evidence. *Doe v. S. Iron R-1 Sch. Dist.*, 498 F.3d 878, 880 (8th Cir. 2007) (verified complaint); *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir. 1983) (declaration).

## ARGUMENT

Section 609.771 is an unconstitutional attempt to regulate the use of AI-generated political commentary. The State lacks any valid interest in regulating the truthfulness of the populace's political discussions, and its attempt to do so here by simply barring an entire means of political speech (AI-generated memes) is not narrowly tailored. Separately, § 609.771 unlawfully regulates Plaintiffs' speech based on content and viewpoint by only proscribing memes and videos which (1) are made without the consent of a candidate and (2) are "made with the intent to injure a candidate or influence the result of an election." Finally, because it fails to adequately define certain material phrases in the statute, § 609.771 is both vague and overbroad in violation of the Fourteenth Amendment. Any of these

three fatal flaws means that Plaintiffs are likely to win on the merits of their constitutional claims.

Moreover, Plaintiffs satisfy the remaining requirements to win injunctive relief from this Court. They are irreparably harmed by § 609.771: Their speech is threatened by the law's penalties, they are likely to suffer legal and financial harm if they continue to "meme" as usual, Franson risks election disqualification and permanent ineligibility for state office, and they cannot participate lawfully and fully in the political process as commentator or candidate. The public interest in an injunction is strong: In addition to Plaintiffs, § 609.771 also deters third parties from making their own AI-generated political commentary, and resharing Kohls' and Franson's posts. Finally, there is always a public interest in preventing the violation of political rights. In contrast, the State's interest in cracking down on AI-generated election-related memes is invalid; the antidote to such an issue—if needed at all—is for the State to engage in its own counterspeech.

## I.     Plaintiffs have Article III standing to bring suit to enjoin § 609.771.

"When an individual is subject to [the] threat" of a law's enforcement, an "actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

14

Kohls does not have to wait until he is arrested for violating § 609.771; Franson does not have to wait until she is disqualified from holding political office.

In First Amendment cases, the threshold for standing is "lenient" and "forgiving." *Dakotans For Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (internal quotation omitted); *accord Upper Midwest Booksellers Ass'n v. Minneapolis*, 780 F.2d 1389, 1391 n.5 (8th Cir. 1985) ("relaxed"). To establish standing, Plaintiffs must show (1) they intend to or do engage in conduct "affected with a constitutional interest" (2) that is "arguably proscribed" by the challenged law, and (3) there exists a "credible threat of enforcement." *Parents Defending Education v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) (following *SBA List*). Both Plaintiffs satisfy the test.

*First*, Plaintiffs want to continue generating (for Kohls), consuming (for both), and sharing (for both) AI-generated election-related content on the internet now and in the future heading into the 2024 election, consistent with their past behavior. Social-media posting carries constitutional significance. *E.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (identifying social-media websites as today's "most important places…for the exchange of views").

*Second*, this activity is arguably proscribed by § 609.771, because Kohls's and others' videos retweeted by Plaintiffs may be "so realistic that a reasonable person

would believe it depicts speech" made by the video's target; and, (2) their "production…[plausibly is] substantially dependent upon technical means." Minn. Stat. § 609.771 subd. 1 (2023). Gavin Newsom believed as much. Complaint ¶¶ 8, 72. As did Senator Klobuchar. Complaint ¶¶ 74-75.  Indeed, because Kohls produced his video using such a realistic voice, multiple fact checkers felt the need to address it. Complaint ¶ 73. The vagueness of § 609.771's prohibition—turning on whether the video is believably "realistic" or not to the reasonable person—means that Plaintiffs' activity is at least "arguably proscribed." *See Parents Defending Educ.*, 83 F.4th at 667. "Arguably proscribed" is the test of *SBA List*; not "certainly proscribed," "definitely proscribed," or even just "proscribed." *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718-19 (8th Cir. 2021); *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699-700 (8th Cir. 2021).

Section 609.771 casts an objective chilling effect on Plaintiffs, discouraging them from making, distributing, and consuming the political content that they wish. It threatens the direct imposition of criminal liability, risks sanctions or removal from platforms, and—for Franson—could result in forfeiture of her office and the ability to run in future elections. Moreover, the law chills *others* from creating content that Kohls and Franson would otherwise want to consume and share via retweet, and it deters others from resharing Kohls's and Franson's posts.

Thus, there are two separate avenues for standing to challenge § 609.771 based on Plaintiffs' *future* speech.

Plaintiffs' *past* activity is also arguably proscribed AI-generated political speech, specifically the creation and sharing of videos like Kohls's. Because § 609.771 took effect on July 1 and both Kohls's Harris video and Franson's sharing of it occurred after that date, the Plaintiffs face *existing* criminal liability under the statute. Kohls's video remains on X and YouTube, as does Franson's retweet of it on X. Courts presume new legislation will be enforced, and pre-enforcement challenges are standard in the First Amendment context when a speaker is "forc[ed]…to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly [] proceedings and criminal prosecution on the other." *281 Care Committee*, 766 F.3d at 782 (quoting *SBA List*, 573 U.S. at 168).

*Third*, Plaintiffs satisfy the "credible threat of enforcement" prong. "When dealing with pre-enforcement challenges to recently enacted…statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) (internal quotation omitted). When a statute or policy is new and

there is "no established practice of nonenforcement that could assuage concerns," the "plain text" of the law supplies the necessary credible threat of enforcement. *Parents Defending Educ.*, 83 F.4th at 667; *see also Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019).

## II. Plaintiffs are very likely to win their constitutional claims that § 609.771 violates the First and Fourteenth Amendments to the U.S. Constitution and the Minnesota Constitution's analogous free-speech protections.

For three independent reasons, Plaintiffs' constitutional claims are likely to succeed. First, § 609.771 unconstitutionally discriminates against political speech based on content and viewpoint. Second, the State has no interest in preventing the videos at issue (or any AI-generated content) about political candidates. Third, § 609.771 suffers from vagueness fatal to the regulation of core political speech.

### A. Section 609.771 is an unconstitutional content-based and viewpoint-discriminatory regulation of political speech.

Content-based regulations, which target speech based on its topic, idea, or message, are "presumptively invalid." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). A law is content-based if it "draws distinctions based on the message a speaker conveys" through either "subject matter," "function[,] or purpose." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In other words, if "enforcement authorities [need] to examine the content of the message that is conveyed to determine

whether a violation has occurred," then the law is facially content-based and presumptively unconstitutional. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (cleaned up). This is especially so for laws like § 609.771 which target political speech, since this type of speech is the most protected form of expression under the First Amendment. *281 Care Committee*, 766 F.3d at 784; *see also Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1223 (9th Cir. 2019) (laws that single out political speech for disfavored treatment "strike[] at the heart of the First Amendment").

Viewpoint discrimination constitutes a more "egregious" and "blatant" offense to the First Amendment than does an ordinary content-based restriction. *Reed*, 576 U.S. at 156. Viewpoint discrimination is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024). Thus, if a law is "viewpoint-based, it is unconstitutional." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *accord Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018) ("prohibited"); *Matal v. Tam*, 582 U.S. 218, 243 (2017) ("forbidden").

"At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 582 U.S. at 248 (Kennedy, J., concurring). For example, a rule that prohibits denigrating—but not laudatory—speech about certain

characteristics discriminates based on viewpoint by prohibiting only one perspective on a given subject. *See id.*

Section 609.771 bars specific types of AI-generated content *and* viewpoint: that which is (1) "so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct," (2) "made with the intent to injure a candidate or influence the result of an election," and (3) that is created without a candidate's consent. Subd. 1(c)(1); subd. 2(2)-(3). Each element independently regulates content, and the latter two are also unconstitutional viewpoint regulations.

The first two requirements—that the content is realistic and made with the intent to injure a candidate or influence an election—target speech based on "the topic discussed or the idea or message expressed," *Willson v. City of Bel-Nor*, 924 F.3d 995, 1000 (8th Cir. 2019) (quoting *Reed*, 576 U.S. at 163). This makes it "presumptively unconstitutional" as a content regulation. *Id.* (quoting *Reed*, 576 U.S. at 163); *accord R.A.V.*, 505 U.S. at 382 ("presumptively invalid"). Section 609.771's focus on election-related truthfulness makes the Eighth Circuit's decision in *281 Care Committee* doubly applicable: There, the court rejected Minnesota's attempt to "regulat[e] falsity in the political realm" by criminalizing the dissemination of false information about ballot questions. *281 Care Committee*, 766

F.3d at 778, 787. This is because "when these preservation goals" to protect the integrity of elections "are achieved at the expense of public discourse, they become problematic." *Id.* at 786. Just like in *281 Care Committee*, Minnesota's attempt to "enhance[e] the ability of its citizenry to make wise decisions by restricting the flow of information to them" "must be viewed with some skepticism," to put it lightly. *Id.* (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228 (1989)). Just because Plaintiffs could hypothetically spread the same political message without AI-generated memes and videos does not preserve the statute; the medium for speech is part-and-parcel of analyzing whether a law is an invalid content regulation. *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 510 (D.C. Cir. 2016) ("whether a burden on speech leaves open alternative means of expression does not factor into whether a speech ban is content based.").

The second and third elements—the (2) intent to injure a candidate or influence the result of an election and (3) that the content be made without a candidate's consent—are not merely content regulations: they discriminate based on viewpoint. Both unlawfully proscribe speech based on the "message expressed," *i.e.*, by asking what the intended electoral effect of content is and whether the candidate at issue approves of it. *Willson*, 924 F.3d at 1000. The second element privileges speech intended to ossify existing voting patterns over speech

intended to alter voting patterns. The third element prohibits negative political commentary toward the candidate depicted, while allowing positive or laudatory commentary. Dictating the perspective of the speaker is viewpoint discrimination. *Matal*; *Speech First*.

The third element also creates a nonsensical asymmetry for electoral speech: Under § 609.771 a candidate (or her supporters) is free to use AI-generated content to *boost their own campaign*, while the common man is barred from criticizing that same candidate using the same medium. Excluding deepfakes that support, and thus are consented to by a candidate, not only makes the statute unconstitutionally underinclusive,[4] it is fundamentally antithetical to its claimed objective: § 609.771 privileges candidate misinformation with a safe harbor for candidate consent: AI-deepfakes for me, but not thee.

In the end, the First Amendment protects the right of *all* citizens "to debate so they can learn and decide and then, through the political process, act in concert to try to shape the course of their own times." *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 312 (2014). Section 609.771 precludes the public's full participation in the "political process," *id.*, while preserving the same

---

[4] *E.g., 281 Care Committee*, 766 F.3d at 794.

messaging mediums for establishment politicians. This type of arbitrary, underinclusive, even counterproductive line drawing is unconstitutional. *Grimmett v. Freeman*, 59 F.4th 689, 694-96 (4th Cir. 2023) (following *R.A.V.*).

As a viewpoint-discriminatory restriction of speech, § 609.771 is *per se* unconstitutional. As a content-based restriction, it is presumptively unconstitutional, and as discussed in the next section, cannot satisfy strict scrutiny.

**B.** **The State has no cognizable interest in preventing AI-generated political content about politicians or election issues.**

The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022); *accord Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013) (discussing *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 365 (2010)). It has "consistently rejected attempts to restrict campaign speech based on other legislative aims" because, "[h]owever well intentioned," they would "tamper with the right of citizens to choose who shall govern them." *Ted Cruz for Senate*, 596 U.S. at 305-06 (internal quotation omitted).

The plain text and statutory aim of § 609.771 is not the prevention of 'quid pro quo' corruption or the appearance thereof. Instead, it targets individuals'

political speech for the purpose of trying to promote accurate portrayals of candidates' acts and words during election season, hence its focus on "deepfakes." House debate over HF 1370 illustrates this purpose. Rep. Neu Brindley moved to amend it to exclude still images because "it is difficult to infer speech or conduct when it comes to an image."[5] Sponsor Rep. Stephenson did not deny that the bill sought to outlaw inaccurate portrayals of candidates' "speech or conduct," and instead argued against the amendment that still images could also imply false events. He cited a "still image deepfake" of a "former president of the United States being arrested…and that did not happen…and some of those images could be construed by a voter to be authentic."[6] He asked members to imagine such images mailed to voters a week before the election "without any opportunity to redress."[7]

---

[5] MNHouseInfo, *House Floor Session 3/30/23*, YOUTUBE (at 1:13:20) https://www.youtube.com/watch?v=OyAZkqMGgMQ&t=4420s.

[6] *Supra* n.5 (at 1:21:10), https://youtu.be/OyAZkqMGgMQ?t=4870s. Rep. Stephenson apparently referred to AI-generated images of Trump being arrested, which were posted ten days before this floor session with the comment "Making pictures of Trump getting arrested while waiting for Trump's arrest." Complaint ¶ 43.

[7] *Supra* n.5 (at 1:21:41), https://youtu.be/OyAZkqMGgMQ?t=4901s.

However utopian an electoral season without misinformation would be, the State cannot justify prescribing orthodoxy in the realm of political truth—this is a timeless constitutional principle. *281 Care Committee*, 766 F.3d at 786-87; *Kohls*, 2024 U.S. Dist. LEXIS 179933, at *13 ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence") (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927); *Alvarez*, 567 U.S. 709. Because § 609.771 regulates political speech for a different reason than avoiding corruption, it is unconstitutional.

This is not to say that states have no valid interest in protecting the integrity and reliability of the electoral process. They do. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008). Specifically, states have an interest in speech that frustrates the operation of elections (and therefore jeopardizes voters' rights to cast their votes). Defendants may be inclined to cite *Minnesota Voters Alliance v. Ellison*, No. 23-CV-2774 (NEB/TNL), Dkt. 53, 2024 WL 4222829, 2024 U.S. Dist. LEXIS 170296 (D. Minn. 2024), as support for the proposition that the State has a valid interest in regulating political "deep fakes." That would be error. In *Minnesota Voters*, Judge Brasel upheld a law which she wrote "prohibits making materially false statements with the intent to prevent someone from voting." That statute targeted "speech about who is eligible to vote," which to Judge Brasel is a

voting mechanics issue, "rather than who *should be* eligible to vote," which is unquestionably a political issue. 2024 U.S. Dist. LEXIS 170296, at *8 n.6. It did not involve "core political speech…about political candidates" (*id.*) like § 609.771 does.[8]

As *Minnesota Voters* readily admits, laws like § 609.771 which target "false information about a political candidate" and "prohibit robust debate" are subject to strict scrutiny and the First Amendment's most rigorous protection. 2024 U.S. Dist. LEXIS 170296, at *10 & n.8. Cases like *281 Care Committee*—which Judge Brasel found inapplicable to *Minnesota Voters*—are binding precedent here.

The state's interest in securing elections has *no* application to political speech that does not hinder the mechanics of the election like Plaintiffs' videos and memes. *See*, *e.g.*, *Ted Cruz for Senate*. In other words, § 609.771 has **no** tailoring to

---

[8] It is quite conceivable that the Court here could have come to a different conclusion on the speech code challenged in *Minnesota Voters*. Those plaintiffs want to speak about whether Minnesota's felon-voting law actually restored voting rights consistent with the Minnesota Constitution. *See id.* Felon voting prior to sentence-completion and whether expanding felon voting rights follows the Constitution are contentious political issues in Minnesota. Restricting speech on contentious political issues is always constitutionally suspect. Judge Brasel categorized the speech in *Minnesota Voters* otherwise, but district judges are not bound by other district judges' decisions, even in "the same judicial district." *Reid v. BCBSM, Inc.*, 111 F. Supp. 3d 966, 968 (D. Minn. 2015) (quoting *Camreta v. Greene*, 563 U.S. 692, 131 S.Ct. 2020, 2033 n.7 (2011)).

its implied interest, let alone the narrow tailoring or the least restrictive alternative that strict scrutiny demands of a content-based law. *281 Care Committee*, 766 F.3d at 785-96.

*281 Care Committee* is directly on point. There, the court allowed First Amendment claims to proceed against a Minnesota law that proscribed false electoral speech. "Directly regulating what is said or distributed during an election, as [§ 609.771] does, goes beyond an attempt to control the process to enhance the fairness overall so as to carefully protect the right to vote." *Id.* at 787. Even if the abstract notion of elections free of misinformation represented a compelling interest (*281 Care Committee* reserved the question, *id.*), like the *281 Care Committee* statute, § 609.771 is neither narrowly tailored to nor the least restrictive means of achieving that interest. *Id.* at 787-96.

*281 Care Committee* faulted the reviewed election-misinformation statute for lacking any "empirical evidence" of harm and instead relying on "common sense to establish that the use of false statements impacts voters' understanding, influences votes and ultimately changes elections." *Id.* at 790. So too here; in the legislature, when the bill's sponsors were asked whether politically consequential deepfakes have actually occurred, Rep. Stephenson admitted they have not in Minnesota, and that the bill was "prophylactic"; likewise Sen. Maye Quade

admitted that there were no "concrete real-world examples to point to—to say here is an example of harm that was done with a deepfake" and explained that "we're trying to stop it from starting instead of addressing something that's currently happening—or, currently harming people in a broad way." Complaint ¶¶ 41, 47. Prophylaxis doesn't cut it. *See, e.g., Alvarez*, 567 U.S. at 726-27. The government "must do more than simply posit the existence of the disease sought to be cured; it must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Ted Cruz for Senate*, 596 U.S. at 307.

The defendants in *281 Care Committee* argued (unsuccessfully) that a knowing or reckless *mens rea* requirement provided the breathing space necessary to protect free speech. *Id.* at 788. Section 609.771 uses this standard: "knows or acts with reckless disregard about whether the item being disseminated is a deep fake," subd. 2, so fails for the same reason. The *mens rea* requirement offers even less protection in the case of parody, because satirists like Kohls *know* their content is not real—lampooning politicians with exaggerated caricatures is the entire purpose of their message.

Just as in *281 Care Committee*, § 609.771 "perpetuate[s] the very fraud it is allegedly designed to prohibit." *Id.* at 789. It not only allows the Attorney General

and other state officials to bring complaints, it allows speakers' political adversaries to do so. Minn. Stat. § 609.771 subd. 4(3)-(4). "Complaints can be filed at a tactically calculated time so as to divert the attention of an entire campaign" and inflict maximum "political damage." *281 Care Committee*, 766 F.3d at 790. Simply put, the filing of a complaint itself inflicts the damage. *Id.* at 792. This concern is more real than hypothetical for Rep. Franson, whose opponent in this election cycle lives across the street from her, has previously dug through her trash to post her cellphone number online, and has an interest in censoring political speech judging by his recent arrest for stealing scores of political yard signs. Complaint ¶ 34. The potential for abuse from § 609.771 is even greater than the *281 Care Committee* "false statements" statute because convictions include the punitive sanction of **disqualification from office**. § 609.771 subd. 3(3)(b)-(c).

Finally, as in *281 Care Committee*, there exists a less restrictive alternative to government speech restraints: counterspeech. 766 F.3d at 793. Private fact checkers already have "fact-checked" Kohls's Harris video (Complaint ¶ 73), and there is no reason why the state or a state agency could not engage in the same speech. *See infra at* 39-40 (discussing the possibility of "public-information campaigns"). "Especially as to political speech, counterspeech is the tried-and-true buffer and elixir" to falsehood, not speech restriction. *Id.* at 793; *Kohls*, 2024 U.S. Dist. LEXIS

at *3. Candidates themselves typically do this. The Harris campaign long ago responded to Kohls's July 26 video.[9] For truly egregious fakes that harm someone's reputation, longstanding tort law doctrines exist (defamation or false light for example). "Other statutory causes of action such as privacy torts, copyright infringement, or defamation already provide recourse to public figures or private individuals whose reputations may be afflicted by artificially altered depictions peddled by satirists or opportunists on the internet." *Kohls*, 2024 U.S. Dist. LEXIS 179933, at *14. Those regimes are often content-neutral; they do not depend on the election-related content and purpose of the speech.

*281 Care Committee* does not stand alone. On remand in *SBA List*, the Sixth Circuit held that Ohio's law against false political statements could not survive strict scrutiny. 814 F.3d 466, 473-76 (6th Cir. 2016). Although the court recognized that the general interest in election integrity is compelling, Ohio's law against speech was not narrowly tailored to that interest; "courts have consistently erred on the side of permitting more political speech than less." *Id.* at 476. So too in *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002). The Eleventh Circuit invalidated

<hr>

[9] *Kamala Harris Campaign Reacts to Elon Musk Sharing Fake Ad About VP*, NEWSWEEK (Jul. 28, 2024), https://www.newsweek.com/kamala-harris-fake-campaign-ad-elon-musk-1931222 [https://archive.ph/5xqWu].

a judicial canon that punished even negligently false speech, which the state had justified in part on its interest in electoral integrity. *Id.* at 1320. That stated interest could not justify the "dramatic chilling effect" on political speech. *Id.* Again, the *Weaver* court noted that counterspeech—not proscription—was the correct solution: "The ability of an opposing candidate to correct negligent misstatements with more speech more than offsets the danger of a misinformed electorate that might result from tolerating negligent misstatements." *Id.*

"Free and fair elections" require "preserv[ing] an uninhibited marketplace of ideas in which truth will ultimately prevail,"[10] not closing it to deepfakes that the state deems too "realistic" and "made with the intent to injury a candidate or influence the result of an election." It is exactly *for* the sake of free and fair elections that we must live with "misinformation" (which is often nothing more than commentary or satire branded by self-interested politicians as "misinformation"). "It is the citizenry that can discern for themselves what the truth is, not an ALJ behind doors." *281 Care Committee*, 766 F.3d at 793.

For these reasons, the State's crackdown on Plaintiffs' AI-generated political speech lacks the necessary interest or tailoring to justify such a regulation.

---

[10] *X Corp. v. Bonta*, __F.4th__, 2024 U.S. App. LEXIS 22456, at *18 (9th Cir. Sept. 4, 2024) (quoting *Coakley*, 573 U.S. at 476)

### C. Section 609.771's failure to define its material terms makes the law unconstitutionally vague and overbroad.

To determine whether a law improperly regulates constitutionally protected conduct, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n.6 (1982). In the First Amendment context, the Constitution "demands a greater degree of specificity than in other contexts." *Parents Defending Educ.*, 83 F.4th at 668 (internal quotation omitted). Vagueness can prevent a statute from realizing the constitutionally-required narrow tailoring. *Phelps-Roper v. Koster*, 713 F.3d 942, 951 (8th Cir. 2013). Section 609.771 "'relies on various subjective terms and awkwardly-phrased *mens rea*,' which has the effect of implicating vast amounts of political and constitutionally protected speech." *Kohls*, 2024 U.S. Dist. LEXIS 179933, at *10.

For example, in defining the "deep fakes" it seeks to proscribe, § 609.771 does not explain what might be meant by content "so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct." What is "so realistic" to one reasonable person, is not at all realistic to another. Rob Weissman, co-president of Public Citizen opined that "I'm certain that most people looking at it don't assume it's a

joke…precisely because it feeds into preexisting themes that have circulated around her, most people will believe it to be real." Complaint ¶ 74. As a matter of artistic sensibilities, this inquiry is "inherently subjective" and therefore unconstitutionally vague. *City of Chicago v. Morales*, 527 U.S. 41, 62-64 (1999). Does "realistic…speech" describe only Vice President Harris's voice in Kohls's satirical ad (e.g., it *sounds* like her)? Or, does it describe the speech in the context of the entire video (e.g., it *sounds* like Harris *and* this is something a reasonable person believes she'd say)? The statute does not say.

Next, consider what § 609.771 means when requiring proscribed content to be "substantially dependent upon technical means." Subd. 1(b)(2). The ambiguity of this phrase is illustrated by Kohls's Harris videos: While he uses AI-generated "technical means" to imitate Harris's voice, the graphic content is real and borrowed from actual speeches. Is this type of video "substantially dependent upon technical means" or not? Does "technical means" only apply to AI-generated content, or does it further encompass technology like video editing or even *cameras* used to capture real-life footage? One of the bill's sponsors, Sen. Maye Quade, appeared to believe that editing does *not* require "substantial technical means" because "it just requires like a small editing tool on a computer," and editing supposedly did not fall within the definition because it literally "shows someone

giving a speech they did in fact give, whether they edited it together a little misleadingly or not."[11] This response raises further questions: does altering the background of a video or running it through an easy-to-use Snapchat filter involve "substantial technical means"? What about assembling individual recorded words of a candidate and stitching them together into a speech they never gave? Different result if the Frankenstein's-monster speech is smoothed over using audio processing to sound realistically delivered? Does it depend on whether machine learning was involved in creation? The amount of computer processing used? Plaintiffs have no idea. Without further clarity, no limit exists to the scope of content plausibly barred by § 609.771.[12]

Perhaps the most damning example of vagueness is § 609.771's requirement that the AI-generated content be "made with the intent to injure a candidate or

---

[11] Minnesota Senate Media Services, *Committee on Elections – 03/14/23*, YOUTUBE (at 1:27:33), https://www.youtube.com/live/eABxOrPeM2I?t=5381s.

[12] At another hearing, Sen. Maye Quade remarked that the bill would not criminalize *Saturday Night Live* because it carves out physical impersonations. Complaint ¶ 46 (referring to § 609.771 subd. 1(c)(2), which excepts realistic fake media made through "the ability of another individual to physically or verbally impersonate such individual."). Bully for SNL, but the fact that a well-known political comedy avoids criminality only for technological reasons shows the breathtaking sweep of the law. Physical impersonations can be quite realistic. *See* SNOPES, *Did Sarah Palin Say: 'I Can See Russia from My House'?* (Jan. 28, 2011), https://www.snopes.com/fact-check/sarah-palin-russia-house/.

influence the result of an election." Subd. 2(2). What is the line between "injur[ing] a candidate" and simply persuading someone to vote for someone else or pointing out a perceived political flaw? Plaintiffs have no fair notice based on the statute. What line exists between speech about *any* candidate and whether it "influenc[es] the result of an election?" With American society as polarized as it is, any information about any candidate is plausibly a line of attack. A generic Democrat will tell you Trump's call for a border wall harms his electoral prospects; a generic Republican claims the opposite. The same concept applies to Harris's recent "price gouging" proposal, and so on. Kohls and Franson can invent some hysterical policy by "Harris" that their followers will find laughable—imagine a video where the voice of "Harris" announces that she will set the minimum wage to $50/hour—but some voters might be *more* inclined vote for the AI-generated Harris announcing them.[13]

---

[13] Defendants might argue that the ambiguity of "injure a candidate or influence the result of an election" is not ambiguous because violators must have that "intent"—whatever it is. The *mens rea* "intent" required does not save it from unconstitutional vagueness because the object of that intent remains vague. *See Baggett v. Bullitt*, 377 U.S. 360, 369 (1964) ("knowing" mens rea qualification did not save statute from vagueness challenge); *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286-87 (1961) (same).

Think of the intended audience for Kohls's and Franson's videos, too: Plaintiffs know—based on their followers and engagements—that the people watching these videos who vote are likely voting against Harris already. Do these videos have any discernable "influence" on the election if their general audience's voting behavior is unlikely to change? Does the statute only apply to close elections where the "result" might plausibly change?

All these examples are classic terms of degree that "vest[] virtually complete discretion in the hands of" those who bring suit against speakers, whether it be an enforcement official like Defendants or a third party seeking injunctive or equitable relief. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) (finding unconstitutionally vague the distinction between "general" description and "with elaboration"). Due process does not permit this.

In the First Amendment context, the void-for-vagueness doctrine disallows even the "real possibility" of "discriminatory enforcement"—the mere "opportunity for abuse." *Gentile*, 501 U.S. at 1051; *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21 (2018) (internal quotation omitted). The discretion provided by § 609.771 is especially broad because the "enforcement officials" include not only the county attorneys of Minnesota—who can bring criminal charges—but the political

opponents of the speaker. Plaintiffs bear the cost of defending against such suits—in time and in money—even if they're ultimately victorious. *281 Care Committee*, 766 F.3d at 792.

Confusing, subjective, and broad language permeates § 609.771; unconstitutional vagueness independently demands an injunction against it.

### III.    Plaintiffs are irreparably harmed by § 609.771.

"When an alleged deprivation of a constitutional right is involved, such as the right to free speech [], most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed. Apr. 2020 update). Both the Eighth Circuit and the Supreme Court hold that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "[A]ny First Amendment infringement that occurs with each passing day is irreparable." *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975). The "chill on…free speech rights—even if it results from a threat of enforcement rather than actual enforcement—constitutes irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

Section 609.771 chills both Plaintiffs from creating, sharing, and receiving desired political commentary. This is because (a) they and other speakers will likely face suit and/or criminal liability for similar videos under § 609.771; (b) they'll bear costs to defend themselves against lawsuits aimed to deter or prevent their political speech; (c) their videos likely breach YouTube and/or X's terms of service because the content is plausibly unlawful under § 609.771—as Senator Klobuchar, an attorney, observed; (d) for the same reason, their content could result in sanctions such as deplatforming or temporary suspensions by YouTube or X; and, (e) Representative Franson risks forfeiture and permanent disqualification for future office for sharing content barred by the law. This chilling effect materially impedes Kohls's ability to monetize his X and YouTube accounts and, more importantly for the purposes of a preliminary injunction, it inhibits both Plaintiffs from speaking their minds politically. While § 609.771 has not yet been enforced, the threat of enforcement is clear and real.

**IV. The public interest and the balance of the equities weigh in favor of granting Plaintiffs' preliminary injunction.**

The remaining two factors to be considered—the public interest and whether other interested persons would be benefited or harmed by an injunction—weigh in favor of granting Plaintiffs' Motion. Courts considering

preliminary injunctions "have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (collecting cases and citing *Iowa Right to Life*, 187 F.3d at 970). Section 609.771 deters the uninhibited political speech of all Minnesotans and those trying to communicate with Minnesotans through its regulation of AI-generated media. It is "always in the public interest [for the Court] to prevent the violation of a party's constitutional rights." *Bao Xiong ex rel. D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019).

On the other side of the equation and as discussed above, *supra* II.B, Minnesota lacks a valid interest in regulating Plaintiffs' political speech to ensure truthful elections, however noble a cause that may be. If Minnesota is truly concerned about Plaintiffs' creation and dissemination of videos and others like it delegitimizing elections, then the antidote to that is the truth. "The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth." *Alvarez*, 567 U.S. at 727 (Plurality Op. of Kennedy, J.). That speech can be the government's own, delivered through, for example, a "public-information campaign." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 775 (2018). Minnesota may promote its own content that points out Plaintiffs' videos are AI-generated; it might assign staff to issue responses like "this media is

AI-generated," to assist any Minnesota residents that might think otherwise. But the government may not "co-opt" private parties to act as the mouthpiece of politicians' preferred message. "If there be a time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring).

**V.    Plaintiffs should not be required to post a bond as normally required by Federal Rule 65(c).**

Federal Rule of Civil Procedure 65(c) invests the district court with the discretion of security required, if any. *Stockslager v. Carroll Elec. Cooperative Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). A bond is not appropriate or necessary here: Plaintiffs have a high probability of success on the merits, the costs and damages from granting a preliminary injunction are insignificant, *Brooks v. Francis Howell School District,* 599 F.Supp.3d 795, 806 (E.D. Mo. 2022), and—most importantly— Plaintiffs bring this claim to protect constitutional rights, both for themselves and the people of Minnesota. *Goyette*, 338 F.R.D. at 120; *Bukaka, Inc. v. County of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993) (no bond because First Amendment rights implicated). This is a public-interest case seeking declaratory and injunctive relief and there is no risk of monetary loss to the Defendants from the injunction. *Bukaka,*

*Inc.*, 852 F. Supp. at 813; *see also* 11A Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2954 (3d ed. 2020) (collecting cases).

## CONCLUSION

Section 609.771 is not narrowly drawn, lacks a compelling interest, regulates the truthfulness of political speech, and is unconstitutionally vague. Accordingly, the law is unconstitutional and this Court—because of the irreparable harm to Plaintiffs, the public interest in an injunction, and the equities weighing in Plaintiffs' favor—should enjoin Defendants from enforcing it in its entirety.

Dated: October 11, 2024             Respectfully submitted,

/s/ M. Frank Bednarz
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Alexandra K. Howell (#0504850)
UPPER MIDWEST LAW CENTER
12600 Whitewater Drive, Suite 140
Minnetonka, MN 55343
Voice: 612-428-7000
Email: Doug.Seaton@umlc.org
James.Dickey@umlc.org
Allie.Howell@umlc.org

M. Frank Bednarz (*pro hac vice*)
HAMILTON LINCOLN LAW INSTITUTE
1440 W. Taylor St. # 1487
Chicago, IL 60607
Voice: 801-706-2690
Email: frank.bednarz@hlli.org

*Attorneys for Plaintiffs Christopher Kohls
and Mary Franson*