## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

CHRISTOPHER KOHLS and MARY
FRANSON,

*Plaintiffs,*

v.

KEITH ELLISON, in his official capacity as
Attorney General of Minnesota, and CHAD
LARSON, in his official capacity as County
Attorney of Douglas County,

*Defendants.*

Civil Action No. 0:24-cv-3754-ECT-DLM

**[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION**

This matter came before the Court on _____, 2024, on Plaintiff's motion

for a preliminary injunction. Appearances were noted on the record. Based on the

files, records, and proceedings herein, the Court issues the following findings of

fact, conclusions of law, and order.

## FINDINGS OF FACT

1.      Plaintiff Christopher Kohls is an online content producer who earns a

living through the "monetization" of political videos posted to the "Mr Reagan"

YouTube channel and @MrReaganUSA on X, formerly known as Twitter. Verified

Compl. ¶¶ 17, 78. Kohls has over 100,000 followers on each platform. *Id*. ¶ 17.

2.    Among the videos Plaintiff Kohls has produced is one uploaded on July 26, 2024 and entitled "Kamala Harris Ad PARODY" (The "July 26 video"). This video is less than two minutes long and produced in the style of a campaign ad, with a voiceover narration generated by generative artificial intelligence (AI) tools to sound like Kamala Harris, saying things that she never said. Verified Compl. ¶ 8. The video was viewed more than 100 million times on X, in part because it was retweeted by the site's owner Elon Musk. *Id.*

3.    News organizations issued "fact-checks" for the July 26 video, explaining that Kamala Harris did not actually speak the narration of the parody. Verified Compl. ¶ 73.

4.    California Governor Gavin Newsom referred to the July 26 video as a "misleading deepfake in the middle of an election" and took steps to make the video purportedly illegal under California state law. Verified Compl. ¶¶ 8, 72.

5.    Senator Amy Klobuchar opined that the July 26 video violated X's rules against "media that is significantly and deceptively altered, manipulated or fabricated" or "likely to result in widespread confusion on public issues." Verified Compl. ¶ 75.

6.     It was reported that Rob Weissman, co-president of the advocacy group Public Citizen opined that "most people" would be deceived by the July 26 video: "I'm certain that most people looking at it don't assume it's a joke… precisely because it feeds into preexisting themes that have circulated around her, *most* people will believe it to be real." Verified Compl. ¶ 74.

7.     Plaintiff Kohls' asserts his livelihood could be harmed by enforcement of Minn. Stat. § 609.771, which may result in the removal of his videos from the social media platforms of X and YouTube, from which he derives a living through monetization of his video content. Verified Compl. ¶ 78. Kohls also asserts this law chills his ability to create and disseminate protected political speech. *Id*. ¶ 79.

8.     Plaintiff Mary Franson is a Minnesota State Representative from District 12B currently running for re-election, who intends to run again in future elections. Verified Compl. ¶¶ 3, 34.

9.     Plaintiff Kohls frequently shares "memes" on her social media accounts, including @RepMaryFranson, which has a "biography" reading "Memes, Jesus, Coffee (not necessarily in that order)." Verified Compl. ¶ 4.

10.     On July 27, Plaintiff Franson retweeted the July 26 video, which was embedded in Elon Musk's tweet on X. Verified Compl. ¶ 5.

11.     Plaintiff Franson asserts her activity on social media is chilled by Minn. Stat. § 609.771, because much of the political content she shares is in the form of "memes"—images and video clips often generated or edited using AI tools. Verified Compl. ¶ 81.

12.     Additionally, Plaintiff Franson does not wish to be disqualified from political office, which results following a conviction under Minn. Stat. § 609.771 as amended and effective July 1, 2024. Verified Compl. ¶¶ 82-83.

13.     Finally, Plaintiff Franson fears operation of the civil remedies under Minn. Stat. § 609.771, which she finds a genuine a threat given that her opponent in her current election has rooted through her trash in an attempt to embarrass her online and was recently arrested for stealing campaign yard signs—i.e. for attempting to suppress opposing political speech. Verified Compl. ¶¶ 34, 81.

14.     Plaintiff Franson knows that other Republicans have "tamped down" on their social media activity out of concern for § 609.771. Verified Compl. ¶ 36.

15.     Minn. Stat. § 609.771 aims to proscribe "deep fake" content, which "means any video recording, motion-picture film, sound recording, electronic image, or photograph, or any technological representation of speech or conduct substantially derivative thereof: **(1)** that is so realistic that a reasonable person

would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct; and **(2)** the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." § 609.771 subd. 1(c).

16.     Section 609.771 proscribes certain uses of "deep fakes," subd. 2:

**Use of deep fake to influence an election; violation.** (a) A person who disseminates a deep fake or enters into a contract or other agreement to disseminate a deep fake is guilty of a crime and may be sentenced as provided in subdivision 3 if the person knows or acts with reckless disregard about whether the item being disseminated is a deep fake and dissemination:

(1) is made without the consent of the depicted individual; and

(2) is made with the intent to injure a candidate or influence the result of an election; and

(3) takes place either:

(i) within 90 days before a political party nominating convention; or

(ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election.

(b) This subdivision does not apply to a broadcaster or cable television system that disseminates a deep fake produced by a candidate if the broadcaster's or cable television system's dissemination is required by federal law.

17.     A person convicted § 609.771 may be sentenced to imprisonment and fines, and "[i]n the case of a candidate for state or local office convicted … the court must enter a supplemental judgment declaring that the candidate has forfeited the nomination or office in accordance with section 211B.17." § 609.771 subd. 3(b). Further, "[a] candidate for state or local office or other individual convicted… is disqualified from being appointed to that office or any other office for which the legislature may establish qualifications under the Minnesota Constitution…" § 609.771 subd. 3(c).

18.     Neither defendant is a broadcaster or cable television system.

19.     The July 26 video was made without the consent of the depicted individual, Kamala Harris, and it was created by Plaintiff Kohls with the intent of injuring her electoral prospects and therefore to influence the result of an election. Verified Compl. ¶ 28.

20.     Defendant Kohls' posting of the July 26 video and Defendant Franson's re-posting of the video from her X account both occurred less than 90 days before a political party nominating convention, the Democratic National Committee Convention, which occurred in late August and nominated Kamala

Harris for U.S. Presidency. Verified Compl. ¶ 32. The video, including Plaintiff

Franson's retweet remain available online.

## CONCLUSIONS OF LAW

### I.      Standing

21.     While the Plaintiffs' have not been threatened by prosecution by the

Defendants, they have standing to challenge § 609.771 because their past conduct

and similar future conduct constitute a colorable violation of the statute. "When

an individual is subject to [the] threat" of a law's enforcement, an "actual arrest,

prosecution, or other enforcement action is not a prerequisite to challenging the

law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

22.     To establish standing, Plaintiffs must show (1) they intend to or do

engage in conduct "affected with a constitutional interest" (2) that is "arguably

proscribed" by the challenged law, and (3) there exists a "credible threat of

enforcement." *Parents Defending Education v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658

(8th Cir. 2023).

23.     Plaintiffs' conduct—posting on social media—clearly carries

constitutional significance. *E.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 104

(2017).

24. Distribution of the July 26 video is arguably proscribed by § 609.771. The video features an AI-generated sound recording realistic enough that apparently-reasonable commentators have suggested it would deceive viewers into believing Vice President Harris said things she did not actually say. Verified Compl. ¶¶ 72-76. As outlined above, the July 26 video, and any others like it, at least arguably[1] meet the other statutory elements prohibited by § 609.771—the video was created with advanced technical means using generative artificial intelligence, was intended to harm the electoral prospects of a candidate (and perhaps outcome) of the upcoming Presidential election, and it was disseminated within 90 days of a nominating convention, without the consent of Kamala Harris, and it remains available online even as voting in Minnesota has commenced.

25. Finally, Plaintiffs satisfy the "credible threat of enforcement" prong. "When dealing with pre-enforcement challenges to recently enacted … statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling

---

[1] The Court uses the modifier "arguably" because the provisions of the law mentioned are vague, as discussed more *infra*, but a prosecuting authority or political opponent could interpret the July 26 video as falling within those elements (in part because of these elements' vagueness), which is sufficient to create an objectively reasonable chill of protected speech. *See 281 Care Committee*.

contrary evidence." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486

(8th Cir. 2006) (internal quotation omitted). When a statute or policy is new and

there is "no established practice of nonenforcement that could assuage concerns,"

the "plain text" of the law supplies the necessary credible threat of enforcement.

*Parents Defending Educ.*, 83 F.4th at 667.

## II.    Preliminary Injunction

26.    The Court will issue a preliminary injunction if the four factors of the

*Dataphase* test favor Plaintiffs. The Court considers: (1) Plaintiffs' likelihood of

success on the merits; (2) the threat of irreparable harm to Plaintiffs; (3) the balance

of this harm and any injury that granting the injunction will inflict on Defendants;

and (4) the public interest in an injunction. *See Rodgers v. Bryant*, 942 F.3d 451, 455

(8th Cir. 2019) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th

Cir. 1981) (en banc)).

27.    In the context of a First Amendment claim, the test generally turns on

the first factor, which is "the most important." *Jones v. Jegley*, 947 F.3d 1100, 1105

(8th Cir. 2020). Where plaintiffs have "established that the law likely violates the

First Amendment," the three remaining factors are generally satisfied as well.

*Rodgers*, 942 F.3d at 457 (internal citation omitted).

28.     If the Court finds that Defendants' actions are subject to First Amendment scrutiny, the burden shifts to the state to "establish" that the speech restriction satisfies the relevant standard of scrutiny. *Rodgers*, 942 F.3d at 456; *accord Jones*, 947 F.3d at 1105-06; *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

**A.      Section 609.771 is Content-Based and Viewpoint-Discriminatory.**

29.     A content-based regulation "target[s] speech based on its communicative content," restricting discussion of a subject matter or topic. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "As a general matter," a content-based regulation is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

30.     The Court finds that § 609.771 specifically targets speech by content in several ways. In the first place, it draws the line between acceptable and unacceptable content based on the purported truth or falsity of the disseminated media. Further, it targets content where "the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." § 609.771 subd. 1(c)(2). Additionally, it only proscribes content "made with the intent to

injure a candidate or influence the result of an election," which entails content that is politically hostile toward a candidate. Finally, it nonetheless exempts false technologically-generated content when made with "consent of the depicted individual." § 609.771 subd. 2(2).

31.     Each and every one of these elements is a content-based limitation, which requires strict scrutiny. The latter two elements—the "intent to injure a candidate or influence the result of an election" and the lack of consent—are further viewpoint discrimination, and so render the statute *per se* unconstitutional.

### i.     The State Has No Compelling Interest in Preventing AI-Generated Political Content About Politicians.

32.     Even putting aside the viewpoint discrimination, content-based restrictions may only be allowed under "strict scrutiny" in services of a "compelling interest," and state defendants must show that the law is the "least restrictive alternative" for advancing its compelling interests. *281 Care Comm. v. Arneson*, 766 F.3d 774, 793-94 (8th Cir. 2014).

33.     Minn. Stat. § 609.771 is not directed toward supporting electoral integrity. *See, e.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008). The law and the comments of its sponsors confirm it is aimed at preventing harm

to political candidates caused by false media. *E.g.* Verified Compl. ¶ 43. No element of the bill proscribes harm to electoral systems or voter rights.

34.      The lack of purpose in support of voter rights distinguishes the case from *Minnesota Voters Alliance v. Ellison*, No. 23-CV-2774 (NEB/TNL), Dkt. 53, 2024 WL 4222829, 2024 U.S. Dist. LEXIS 170296 (D. Minn. 2024). In *Minnesota Voters*, Judge Brasel held that the statute did not target political speech *per se*, but instead misinformation intended to frustrate the voting rights of listeners. *Minnesota Voters*, by its own words, distinguished laws like § 609.771 which target "false information about a political candidate" and "prohibit robust debate"—these are subject to strict scrutiny and the First Amendment's most rigorous protection. 2024 U.S. Dist. LEXIS 170296, at *10 & n.8. "There are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech." *United States v. Alvarez*, 567 U.S. 709, 731 (2012) (Breyer, J., concurring in the judgment).

35.      The Court finds § 609.771 most analogous to the law banning "false" information concerning ballot initiatives reviewed in *281 Care Comm. v. Arneson* and found to *not* serve the interest of "preserving 'fair and honest' elections and preventing a 'fraud upon the electorate,'" assuming for the sake of argument that

12

such a state compelling interest exists. 766 F.3d at 787 (reserving the question). Minn. Stat. § 609.771 is instead directed toward preventing false information about political candidates.

36.     Nor does § 609.771 attempt to curtail the appearance of quid pro quo corruption. Instead, it targets individuals' political speech for the purpose of trying to promote accurate portrayals of candidates' acts and words during election season (hence the focus on "deep fakes"). Courts have "consistently rejected attempts to restrict campaign speech based on other legislative aims" because, "[h]owever well intentioned," they would "tamper with the right of citizens to choose who shall govern them." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305-06 (2022) (cleaned up).

37.     Finally, § 609.771 does not confine its prohibition to knowing falsehoods that give rise to a "legally cognizable harm" to the interests of another. *United States v. Alvarez*, 567 U.S. 709, 719 (2012). Neither defamation, reputational harm, nor damages of any kind are required to violate the law. Instead, the law targets the dissemination of speech "made with the intent to injure a candidate or influence the result of an election." § 609.771 subd. 2(2). This greatly exceeds *Alvarez*, which limited regulation to prevent cognizable harms like "invasion of

privacy or the costs of vexatious litigation"; "false statements made to Government officials, in communications concerning official matters"; and lies that are "integral to criminal conduct," a category that might include "falsely representing that one is speaking on behalf of the Government, or… impersonating a Government officer." 567 U.S. at 719-722.

38. The Court finds no compelling interest in a blanket ban on computer generated images distributed with electoral intentions—whether "realistic" or not.

39. One of the First Amendment's core purposes is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)). It is essential to a healthy democracy that "debate on public issues [] be uninhibited, robust, and wide-open" which may create a necessary sacrifice that such dialogue "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

40. Because no compelling interest exists, § 609.771 cannot be narrowly tailored. It is not tailored to cognizable interests at all, so should likely be found unconstitutional.

### ii. Even if the State Had a Compelling Interest, § 609.771 Cannot Survive Strict Scrutiny.

41.     Even if the state defendants articulated a compelling state interest applicable to § 609.771, the law cannot pass strict scrutiny because it is not the "least restrictive alternative" for advancing those interests. *281 Care Comm. v. Arneson*, 766 F.3d 774, 793-94.

42.     As in *281 Care Committee*, there exists a less restrictive alternative to government speech restraints: counterspeech. 766 F.3d at 793. Private fact checkers already have "fact-checked" Kohls's Harris video (Complaint ¶ 73), and there is no reason why the state or a state agency could not engage in such corrective speech. "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927).

43.     To the extent that "deep fakes" or any other sort of speech cause tangible damage to persons, these can be addressed through modest revisions to other laws. Revisions may not even be necessary. "Other statutory causes of action such as privacy torts, copyright infringement, or defamation already provide recourse to public figures or private individuals whose reputations may be afflicted by artificially altered depictions peddled by satirists or opportunists on

the internet." *See Kohls v. Bonta*, No. 2:24-cv-02527 JAM-CKD, 2024 WL 4374134, 2024 U.S. Dist. LEXIS 179933, at *14 (E.D. Cal. Oct. 2, 2024).

44.     Because § 609.771 has not been narrowly tailored to *any* purpose, it will likely be found unconstitutional.

**B.     Section 609.771 is Unconstitutionally Vague.**

45.     Independently, the open-ended and subjective definitions of § 609.771 render it unconstitutionally vague.

46.     In defining the "deep fake" media it seeks to proscribe, § 609.771 does not explain what might be meant by content that "is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct." Does it depend on whether a recording is believably realistic, or whether a reasonable person would believe the entire composition to be genuine?

47.     Section 609.771 does not delineate what it means for the generation of media to be "substantially dependent upon technical means." Subd. 1(b)(2). *All* modern media tends to be digital and therefore the product of technical means.

48.     Section 609.771's does not explain what it means for technologically generated content to be "made with the intent to injure a candidate or influence

the result of an election." Subd. 2(2). Does this cover elections that are not plausibly influenced by media? Does it depend on the reach of the content or effectiveness of it to persuade viewers?

49.     Section 609.771 provides no concrete answer to speakers and "vest[] virtually complete discretion in the hands of" those who bring suit against speakers. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) (finding unconstitutionally vague the distinction between "general" description and "with elaboration").

50.     In the First Amendment context, the void-for-vagueness doctrine disallows even the "real possibility" of "discriminatory enforcement"—the mere "opportunity for abuse." *Gentile*, 501 U.S. at 1051; *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21 (2018) (internal quotation omitted). The Constitution "demands a greater degree of specificity than in other contexts." *Parents Defending Education*, 83 F.4th at 668 (internal quotation omitted).

51.     The likelihood of discriminatory enforcement—heightened by the fact that any partisan can sue for an injunctive remedy—make the vague definitions in § 609.771 likely unconstitutional.

**C. Alternatively, Plaintiffs Will Likely Demonstrate That § 609.771's Substantial Overbreadth Facially Violates the First Amendment.**

52. Even if § 609.771 did not include viewpoint discrimination, and was not unconstitutionally vague, it would not survive facial review.

53. "To provide breathing room for free expression," the Supreme Court has "substituted a less demanding though still rigorous standard" for facial challenges. *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2397 (2024) (cleaned up) (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)).

54. As *Moody* sets forth, a First Amendment facial challenge has two parts: first, the courts must "assess the state laws' scope"; and second, the courts must "decide which of the laws' applications violate the First Amendment, and… measure them against the rest." *Id*. at 2398.

55. Under Minn. Stat. § 609.771, even artificially manipulated content that does not implicate reputational harm but could arguably influence a candidate's electoral prospects is swept under this statute and subject to criminal and civil liability.

56. But *all* partisan political speech is "disseminated" with the purpose of influencing an election. The amount of computer-generated political content is

therefore vast, and at the time § 609.771 was passed, problematic political "deep fakes" were unknown in Minnesota. Verified Compl. ¶¶ 41, 47.

57.     Thus, § 609.771 criminalizes virtually all protected political speech made with the assistance of AI (and perhaps less novel technical tools), while only incidentally prohibiting a small subset of that speech that might be actionable— and most of this residual would constitutes defamation or other existing crimes. Given the lopsided prohibition of political speech, the law is facially unconstitutional. *Moody v. NetChoice, LLC*, 144 S.Ct. at 2398.

58.     Therefore, Plaintiffs have shown that they are likely to succeed on the merits of their Free Speech claims.

**D.     Plaintiffs satisfy the remaining *Dataphase* factors.**

59.     Notwithstanding the heavy weight of the merits factor, the Plaintiffs also meet the other *Dataphase* factors.

60.     Because § 609.771 infringes on Plaintiffs' right to Free Speech, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (quoting *Elrod v. Burns*, 427 U. S. 347, 373

(1976)), Plaintiffs have established that they will suffer irreparable injury absent a preliminary injunction prohibiting enforcement of § 609.771.

61.     Additionally, "it is always in the public interest to protect constitutional rights," *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (quoting *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008)). Since Plaintiffs' constitutional speech rights are at stake in this case, the public interest favors injunction.

62.     The balance of equities also favors Plaintiff because, having failed to proffer a compelling interest to justify § 609.771, the Defendants have not shown that a preliminary injunction will cause them any hardship. *See Goyette v. City of Minneapolis*, 338 F.R.D. 109, 120 (D. Minn. 2021) ("When, as here, a plaintiff raises a legitimate constitutional question, the balance of hardships tips sharply in the plaintiff's favor."). This is particularly true here, where the legislators who sponsored § 609.771 could not cite a single problematic example of "deep fakes" occurring in Minnesota. Verified Compl. ¶¶ 41, 47. To the extent that any defamatory or otherwise harmful deepfake occurs in the 2024 election, existing criminal and civil remedies can address such misconduct.

63.     Finally, waiver of the bond requirement is appropriate. *See Goyette*, 338 F.R.D. at 121 ("Courts have concluded that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment.").

## ORDER

For the foregoing reasons, the Court enjoins the Defendants from enforcing or initiating civil actions under Minn. Stat. § 609.771 for the duration of this litigation. The Rule 65 bond requirement is waived for this First Amendment challenge.


IT IS SO ORDERED.

Dated:                                          BY THE COURT:


_____
Eric C. Tostrud
United States District Judge