# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

CHRISTOPHER KOHLS and MARY FRANSON,

                    *Plaintiffs*,

v.

KEITH ELLISON, in his official capacity as Attorney General of Minnesota, and CHAD LARSON, in his official capacity as County Attorney of Douglas County,

                    *Defendants*.

Court File No. 0:24-cv-3754- LMP-DLM

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION — EXPEDITED CONSIDERATION REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... 2

REPLY ARGUMENT .................................................................................................... 3

I.   Article III Standing ................................................................................................ 3

   A. §609.771 does not exempt parody. ................................................................. 4

   B. Plaintiffs face a credible threat of enforcement. ............................................. 6

II.  Content *and* Viewpoint Discrimination ................................................................ 7

III. Facial Overbreadth ................................................................................................ 8

   A. Section 609.771 does not causally link to any cognizable harm. .................. 9

   B. The law's overbreadth fails strict (or intermediate) scrutiny. ..................... 12

      1. Neither intent, nor *mens rea*, nor date limitations sufficiently
         tailor the law. ........................................................................................ 12

      2. The law cannot withstand any level of scrutiny. .................................. 13

IV.  Vagueness ............................................................................................................ 15

V.   Preliminary Injunction ........................................................................................ 16

   A. The public's interest in speech and balance of equities favor injunction. 16

   B. Plaintiffs' acts and timing in bringing their motion do not negate the
      harm. ............................................................................................................. 16

CONCLUSION ............................................................................................................. 18

# REPLY ARGUMENT

Fear of evolving technology "does not give legislators unbridled license to bulldoze…satire protected by the First Amendment." *Kohls v. Bonta*, 2024 U.S. Dist. LEXIS 179933, *14 (E.D. Cal. Oct. 2, 2024).

Defendants' main defense: Minn. Stat. §609.771 does not mean what it says. Ellison claims that the statute exempts parody. Not so. It criminalizes all "deepfakes," sufficiently "realistic" and produced by "technical means." AI-generated parodies are realistic this way, and an unrebutted expert commentary agrees. Dkt.11 ("Mem.") at 6. Ellison's clings to intent. But *every* political commentator has "the intent to injure a candidate or influence the result of[] an election." The law sweeps in all "deepfakes," including realistic satirical creations like Kohls's.

And an "actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The Court should issue a preliminary injunction.

## I. Article III Standing

Ellison describes a fictitious statute. But no safe harbor for parody exists. Moreover, reasonable people, including elected officials, *actually have* found Kohls's videos deceptive. "Realism" exists in degrees, so Plaintiffs' speech remains

3

"arguably proscribed." Defendants need not communicate a threat to prosecute; the "plain text" of the statute governs.

### A. §609.771 does not exempt parody.

The statute defines *deepfakes* as media "substantially" produced using "technical means" and "realistic" enough to confuse "a reasonable person." Ellison contends this "excludes parody" defined "as content that no reasonable person would believe to be factual." Dkt.19 ("Ellison") at 15. Not so.

*First*, commentors *have* construed Kohls's speech as factual. Fact-checkers issued alerts. Mem.6. Amy Klobuchar said that the video violated Twitter's misleading media policy. Mem.7. An expert in AI misinformation opined "people looking at it don't assume it's a joke…precisely because it feeds into preexisting themes [] around her." Mem.7. Defendants do not rebut these or provide evidence that Sen. Klobuchar, among others, is "unreasonable." Their own experts stake no position, but still confirm Kohls's critics: "if the deepfake aligns with the viewer's expectations[], they are less likely to question its authenticity." Dkt.23, ¶8.

*Second*, the legislators did not believe parody to be exempt. Rep. Neu Brindley sought to exempt still images, frequently "cartoonish," considering these "in-bounds." Complaint ¶43. And Rep. Stevenson successfully opposed the amendment, arguing that images could still be deceptive, citing an image ***created***

4

*as a parody*—of Donald Trump being arrested. *Id*. When a legislator thought the bill might outlaw *Saturday Night Live*, Sen. Maye-Quade responded "*SNL* fans can rest easy"—not because parody is exempt, but because *SNL* employs physical impersonation. Compl. ¶46.

*Third*, Ellison's gloss on "realistic" does not exist in the statute, which is unconstitutionally vague about the issue. Mem.32-33. Defendants do not deny the likeness of Kohls's videos' synthetic voice to Kamala Harris's.

*Fourth*, Ellison's citation to *Hustler* demonstrates the chilling nature of the statute *even if* it excluded parody. A jury deliberated concerning the realism of a labelled parody ad to determine whether it "could not reasonably be understood as describing actual facts." *Hustler v. Falwell*, 485 U.S. 46, 57 (1988). The "reasonable person" test makes claims against satire and parody colorable, because they employ realism for rhetorical effect.

This means that under both the statutory definition ("realistic"), and even under Ellison's out-of-thin-air parody exception, speech is trampled. "Realism" is a spectrum, not a binary. *See* Mem.34 n.12. Parody's constitutional protection doesn't turn on whether it "confuse[s]" one, ten, or "even one hundred people." *Novak v. City of Parma*, 932 F. 3d 421, 427 (6th Cir. 2019).

5

The vagueness of the prohibition—whether the video is believably "realistic" or not to the reasonable person—means that Plaintiffs' activity is at least "arguably proscribed." *Parents Defending Education v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023).

## B.   Plaintiffs face a credible threat of enforcement.

Plaintiffs need not wait for "an actual arrest, prosecution, or other enforcement action," but may pursue a pre-enforcement challenge if there is a credible threat of future enforcement of a statute that arguably proscribes his constitutional activity. *SBA List*, 573 U.S. at 158, 161-65. This is a "forgiving standard." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021).

"When dealing with pre-enforcement challenges to recently enacted…statutes that facially restrict expressive activity[], courts will assume a credible threat of prosecution." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) (cleaned up). The law's "plain text" supplies the threat of enforcement. *Parents Defending Educ.*, 83 F.4th at 667. That "plain text" does not include Defendants' imagined parody exemption.

Finally, confirming the credible threat, neither Defendant disavows enforcement. *SBA List*, 573 U.S. at 165. While Larson avers that he is not *currently* investigating any violation, he argues against losing his "discretionary authority."

Dkt.22 ("Larson") at 9, 14. This "harm" only exists because Larson *has not ruled out* prosecution; the lack of "present[]" intention to enforce "do[es] not alter the analysis." *Bryant v. Woodall*, 1 F.4th 280, 288 (4th Cir. 2021). Ellison urges the Court to "consider limiting constructions" (Ellison.40), but does not offer any.[1]

## II.   Content *and* Viewpoint Discrimination

Ellison (at 28) asserts that the statute equally prohibits negative and laudatory viewpoints, but reads "consent" entirely out of the statute. Candidates can freely promulgate *positive* deepfakes because it only applies to content "made without the consent of the depicted individual." Mem.21-22. The law's equal application to *nonconsensual* deepfakes does not absolve it from viewpoint discrimination, because consent *tracks a perspective*. *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (*en banc*) (viewpoint discrimination); *Young America's Foundation v. Kaler*, 370 F. Supp. 3d 967, 989 (D. Minn. Feb. 26, 2019). Allowing speech on the basis of the subject's consent "single[s] out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring).

---

[1] In-court assurances would "not rule out the possibility that it will change its mind and enforce the law more aggressively in the future." *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019).

Ellison attempts (at 29) to analogize *Animal Legal Def. Fund v. Reynolds*, but that anti-trespass statute did not engage in viewpoint discrimination by "prefer[ring] laudatory lies over critical falsehoods." 89 F.4th 1065, 1070 (8th Cir. 2024). The statute here *does*—for deepfakes perpetuated by candidates in support of themselves. It is an unconstitutional speaker-based distinction that "le[aves] unburdened those speakers whose messages are in accord" with particular views. *NIFLA v. Becerra*, 585 U.S. 755, 758 (2018).

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) concerns content discrimination and overbreadth, not facial viewpoint-based discrimination. Ellison.21-22; *see NetChoice, LLC v. Attorney General, Fla.*, 34 F.4th 1196, 1224 (11th Cir. 2022). When, as here, a challenged law restricts pure speech by viewpoint, it cannot be "salvage[d] by…constitutionally permissible applications." *Iancu v. Brunetti*, 588 U.S. 388, 398 (2019). The finding of viewpoint discrimination "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Id.* at 399. The same is true of a facially vague speech-chilling law—it cannot be salvaged by applications to unprotected activity.

### III. Facial Overbreadth

Even if §609.771 only imposes content discrimination, it cannot survive a facial challenge under *NetChoice*. The law criminalizes "realistic" generated content

distributed with the intent to "influence the result of an election"—like all electioneering.

Most applications violate the First Amendment because the statute does not target "legally cognizable harms" or historically-established exceptions to free speech. *United States v. Alvarez*, 567 U.S. 709 (2012) (plurality). None of the statute's limitations alter this fact, nor cure the statue's overbreadth, which prevents it from satisfying strict *or* intermediate scrutiny.

### A.     Section 609.771 does not causally link to any cognizable harm.

Cognizable harms resemble fraud—lies intended to deprive the listener of something "material." *Alvarez*, 567 U.S. at 719, 723. Ellison (at 25) suggests three harms: candidate "defamation," "voter rights," and "free and fair elections."

While fraud is cognizable, the law does not address it. Ellison says it's "defamation" (*id.*), but *he later contradicts himself*—by arguing defamation-type torts—requiring harm to "reputation"—are "insufficient." *Id.* at 33. As in California, the statute here "extends beyond" defamation by requiring no harm to reputation. *Kohls*, 2024 U.S. Dist. LEXIS 179933, *9.

As for voter rights, states' interest in electoral integrity does not apply to political speech beyond falsehoods about voting procedures. *E.g.*, *281 Care Committee v. Arneson*, 766 F.3d 774, 778 (2014); *Commonwealth v. Lucas*, 34 N.E.3d 1242 (Mass. 2015). Courts contrast "lies about 'election procedures'"—where a

9

"narrower restriction[] might pose fewer problems", with lies about campaigns and government officials—areas that should be "categorically immune from liability." Eugene Volokh, *When are Lies Constitutionally Protected*, 4 J. FREE SPEECH L. 685, 704-09 (2024).

Although Defendants focus on the Biden deepfake robocall,[2] Ellison.4, 9-10, the First Amendment does not allow statutes to elide the distinction. Ellison (at 25) says that "[i]ntentionally providing voters with []misleading information injures" the right to vote. Untrue; while states do criminalize interfering with voting, false political speech is protected. Most, if not all, Defendants' cases involve laws safeguarding voting *mechanics*. Ellison.25 (actions defrauding shareholders' votes), 27 (messages intended to prevent voting). The government prosecuted a creator of a false ad encouraging Clinton voters to vote via text. Ellison.28. That court distinguished "content-based regulations of political speech… consistently subject to strict scrutiny," and "speech…related to politics only in so far as it proscribes the procedures governing elections." *United States v. Mackey*, 652

---

[2] -New Hampshire criminally indicted the alleged perpetrator of that call, demonstrating the availability of more narrowly tailored, content-neutral alternatives. David Shepardson, *US political consultant indicted over AI-generated Biden robocalls*, REUTERS (May 23, 2024), https://www.reuters.com/world/us/us-political-consultant-indicted-over-ai-generated-biden-robocalls-2024-05-23/.

F.Supp.3d. 309, 344 (E.D.N.Y. 2023). Ellison's cases involve "speech that is not political in nature"; Minnesota's law targets speech that is. Mem.25-26.[3]

Finally, Ellison alleges (at 25, 33) decidedly intangible *societal harms* to "free and fair elections" and "the state's election-integrity interests." But *Alvarez* would have come out Ellison's way if intangible social harms (respect for the military, veterans, and war medals) permitted the government to "compile a list of subjects about which false statements are punishable." *Alvarez*, 567 U.S. at 710.

*281 Care Committee* controls, as it mirrors the challenged statute. 766 F.3d at 778. Ellison claims (at 30) that the panel only "applied strict scrutiny because the challenged statute 'target[ed] falsity, as opposed to the legally cognizable harms associated with a false statement,'" but no such distinction exists. The statute in *281 Care Committee* purported to target the same harms Ellison claims: "to preserve fair and honest elections and prevent a fraud on the electorate." 766 F.3d at 786. The panel rejected these: "Directly regulating what is said or distributed during an election…goes beyond an attempt to…carefully protect the right to vote." *Id*. at

---

[3] Ellison's other citations to ballot cases like *Soltysik*, *Bishop*, and *Grimes*—which apply a different legal framework—do not imply states can curtail misleading election-related *private speech*.

787. Instead, it "tamper[s] with the right of citizens to choose who shall govern them." *FEC v. Cruz*, 596 U.S. 289, 305-06 (2022). Strict scrutiny applies.[4]

### B. The law's overbreadth fails strict (or intermediate) scrutiny.

#### 1. Neither intent, nor *mens rea*, nor date limitations sufficiently tailor the law.

Ellison repeatedly touts the "actual-malice" standard, but this necessary element is not sufficient when the statute requires no cognizable harm. *281 Care Committee*, 766 F.3d at 794. It "does not eliminate the threat by [the statute's] staggering reach." *Animal Legal Def. Fund*, 878 F.3d at 1197-98. "First Amendment freedoms need breathing space to survive. An intent test provides none." *Wisconsin Right to Life v. FEC*, 551 U.S. 449, 468-69 (2007). The actual malice standard was designed "to tolerate certain speech," it "ought not blossom to become a rationale for a rule restricting it." *Alvarez,* 567 U.S. at 720.

Intent does not resolve the overbreadth. *All* electioneering speech aims to "influence the result of an election." *281 Care Committee*, 766 F.3d at 794.

Finally, contrary to how the law has been justified, Mem.24; Dkt. 23 ¶19, there is no temporal limitation. As in *McIntyre*, the statute "applies not only to

---

[4] *281 Care Committee* rejects Ellison's reliance (at 27) on an *Alvarez* concurrence. 766 F.3d at 784.

[speech] distributed on the eve of an election…but also to [that] distributed months in advance." 514 U.S. at 352. The First Amendment does not take three-month vacations. This lack of tailoring is especially striking given the legislative hypothetical (a deepfake mailing sent a week before an election "without any opportunity to redress" (Mem. 24)), and Ellison's expert's discussion of deepfakes "right before the election (days or even hours, rather than weeks)." Dkt. 23, ¶19.

### 2. The law cannot withstand any level of scrutiny.

The law cannot pass constitutional scrutiny for several reasons.

1. The *mens rea* and other limitations do not sufficiently tailor the statute. *281 Care Committee*, 766 F.3d at 794. Under intermediate or strict scrutiny, "[l]ess-infringing regulation" is obviously possible.

2. These alternatives include counterspeech (*id.*) or "existing criminal laws." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). Criminal law protections already safeguard against the Biden deepfake scenario. *See supra* n.3; Minn. Stat. § 211B.075 (prohibiting interference with voting rights). Ellison (at 33) declares tort remedies inadequate because they require "harm to the depicted person's reputation," but this only demonstrates that the law is not directed to such cognizable harms. The state's free-floating "fair election" interest is not compelling. *See supra*.

13

3. Counterspeech is the "most immediate remedy to an allegation of falsity." *281 Care Committee*, 766 F.3d at 793. It's particularly appropriate for speech within months of elections like in *McIntyre* and here. Had the statute been narrowly tailored to only cover the eve of an election, perhaps it would be truly "impossible to engage in counterspeech," but this is obviously false 90 days before an election.[5] Defendants experts' *ipse dixit* cannot supersede First Amendment doctrine. *See* Plaintiffs' forthcoming Motion to Exclude.

4. Opening the floodgates to retaliatory lawsuits against political opponents "undermines the state's interest in promoting fair elections." *SBA List*, 814 F.3d at 475. That a plaintiff would need to establish standing and state a claim on the merits (Ellison.37) is little comfort because attending to the lawsuit is itself punitive. "[D]amage is done at the time a complaint is filed." *281 Care Committee*, 766 F.3d at 792.

5. When the law is underinclusive because it neglects to address the major aspect of the conceived harm, courts consistently hold that fails narrow tailoring. *E.g.*, *Miller v. Ziegler*, 109 F.4th 1045, 1052 (8th Cir. 2024). Hagiographic deepfakes

---

[5] Ellison (at 32) cites *Davis*, which permitted public financing. Minnesota could take this approach by sponsoring speech to rebut deepfakes. Mem.29. *Davis* shows counterspeech is *not* "impossible."

that promote a candidate are legal. Allowing politicians greater speech rights than independent commentators is perverse. *McIntyre*, 514 U.S. at 351.

## IV. Vagueness

Ellison cites (at 41) several doctrines that employ a reasonable person standard *in the context of historically unprotected speech*. But what is "so realistic" to deceive one reasonable person is not to another. The Constitution "demands a greater degree of specificity" when historically protected speech is implicated. *Parents Defending Educ.*, 83 F.4th at 668 (internal quotation omitted).

The "substantially dependent" on technical means language is also "far from clear". *Sackett v. EPA*, 598 U.S. 651, 681 (2023). Even requirements that "narrow[]" the statutory definition can "create" the vagueness problem. *E.g. Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048--51 (1991).

Ellison again relies on his statutory interpretation, claiming parody categorically exempt, but courts may not "rewrite a law" to make it constitutional. *Iancu*, 588 U.S at 397. Anyway, an atextual parody exemption is as vague as "realistic." Parody is an intrinsically subjective concept.[6]

---

[6] Ellison's expert elsewhere agreed: "reasonable people still might not agree whether you're looking at fake news, hyper-partisan news, satire, or some other form of misinformation." Bednarz Ex.6 (from CALLING BULLSHIT).

15

Finally, scienter requirements cannot resolve vagueness problems because the object of that intent (injuring a candidate or influencing an election) is vague. Mem.35 at n.13.[7]

## V.  Preliminary Injunction

Because Plaintiffs show a likelihood of success, the other preliminary injunction factors follow. Mem.11-12.

### A.  The public's interest in speech and balance of equities favor injunction.

Minnesota would only be harmed by injunction if the statute is constitutional. *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). - If unconstitutional, public interest favors injunction.

### B.  Plaintiffs' acts and timing in bringing their motion do not negate the harm.

Chilled speech is an objective test. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). Plaintiffs are iconoclasts; Franson posts despite unneighborly harassment and negative media attention. Compl. ¶7, 37. The statute objectively chills speech even though the Plaintiffs defy it. "Franson knows that other

---

[7] Larson spills ink arguing that Plaintiffs cannot bring *Monell* claims. Larson 15-30. Plaintiffs have not.

16

Republicans have tamped down on social media because of concern about the law." *Id*. ¶36. In turn, that limits the reach of *Plaintiffs'* speech.

As for timing, *Hotchkiss v. Cedar Rapids Community School District*, 115 F.4th 889 (8th Cir. 2024), is distinguishable. Here, Plaintiffs waited significantly less time to sue than Hotchkiss's 16-month delay—less two months for Kohls, and Franson averred she was unaware of the law's overbreadth until July 29. Compl. ¶35. §609.771 was sandwiched between two deepfake porn provisions Franson supported. *Id*. ¶54. Further, Hotchkiss ceased the acts which substantiated harm—making such harm "speculative." *Id*. at 894. Here, Plaintiffs' retain and continue to post AI-generated videos. By subjecting them to prosecution, the law objectively chills Plaintiffs and those they follow from sharing similar content.

Separately, Ellison's cited cases regarding the "statute [] not cover[ing] the desired activities" are inapplicable. In *Turtle Island Foods v. Richardson*, there was no irreparable harm because plaintiffs' products fell outside the statute and they were advised of such. 425 F. Supp. 3d 1131, 1141 (W.D. Mo. 2019).[8] And in *Ness v. City of Bloomington*, 437 F. Supp. 3d 714, 723 (D. Minn. 2020), the plaintiff had

---

[8] *Turtle Island* is further distinguishable because it addressed commercial speech rather than core political speech. 425 F. Supp. 3d at 1139-40.

17

commitments that defendants would not prosecute. *Id*. But §609.771 criminalizes Plaintiffs' speech, and Plaintiffs have no guarantee from either Defendant.

## CONCLUSION

Plaintiffs respectfully request that the Court enjoin Defendants from enforcing the statute pending the final resolution of this case.

Dated: November 15, 2024              Respectfully submitted,

/s/ *M. Frank Bednarz*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Alexandra K. Howell (#0504850)
UPPER MIDWEST LAW CENTER
12600 Whitewater Drive, Suite 140
Minnetonka, MN 55343
Voice: 612-428-7000
Email: Doug.Seaton@umlc.org
James.Dickey@umlc.org
Allie.Howell@umlc.org

M. Frank Bednarz (*pro hac vice*)
HAMILTON LINCOLN LAW INSTITUTE
1440 W. Taylor St. # 1487
Chicago, IL 60607
Voice: 801-706-2690
Email: frank.bednarz@hlli.org

*Attorneys for Plaintiffs Christopher Kohls and Mary Franson*

18