UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| CHRISTOPHER KOHLS and, MARY FRANSON | Case No. 24-cv-03754 (LMP/DLM) |
| Plaintiffs, | |
| vs. | **DEFENDANT ELLISON'S RESPONSE TO MOTION TO EXCLUDE** |
| KEITH ELLISON, in his official capacity as Attorney General of Minnesota, and CHAD LARSON, in his official capacity as County Attorney of Douglas County, | |
| Defendants. | |

The Court should consider Professor Hancock's amended declaration and paragraph 23 of Professor West's declaration. With respect to Professor Hancock, Plaintiffs correctly argue that his original declaration cites to an AI-hallucinated journal article. Upon reviewing Plaintiffs' motion, Professor Hancock acknowledged the error identified by Plaintiffs and identified two additional AI-hallucinated citations. Professor Hancock has corrected the errors in an amended declaration. He has explained how the errors likely occurred through his use of GPT-4o. And he has explained that the errors do not alter his substantive analysis or conclusions. Experts like Professor Hancock make mistakes. When mistakes happen, they typically go to the weight and credibility of the expert's testimony. The Court should thus consider Professor Hancock's amended

1

declaration and factor the errors and his explanation into the Court's overall assessment of Professor Hancock's credibility.[1]

In addition, Plaintiffs propose striking individual paragraphs of Professor Hancock's declaration and a single paragraph of Professor Jevin West's declaration.[2] In doing so, Plaintiffs misconstrue testimony about basic background information regarding deepfakes and make a host of arguments that—once again—go to weight rather than admissibility. The Court should deny the motion.

## ARGUMENT

It is well-accepted that the evidentiary rules are relaxed at the preliminary-injunction phase, and the declarations easily meet that lower bar. Moreover, even when evaluated under Rule 702, Professor West's and Professor Hancock's declarations satisfy the requirements for admissibility of expert testimony. Finally, Plaintiffs' arguments about what conclusions the Court should draw from the expert declarations if it denies the motion are not properly before the Court and are meritless in any event.

---

[1] The Attorney General has moved for leave to file the amended declaration from Professor Hancock, Docs. 34, 37, and this memorandum cites to Professor Hancock's amended declaration. The Attorney General has explained why it believes that the Court should allow the amended declaration to be filed, and the intent of that motion is that the amended declaration will supplant the original declaration (similar to how an amended complaint supplants the original complaint). But if the Court disagrees and denies the motion for leave, the Attorney General has no objection to the Court's exclusion of the original declaration. The Attorney General will not rely on the original declaration.

[2] With respect to Professor West, Plaintiffs' memorandum states more generally that the Court should exclude "conclusory material." *See, e.g.*, Doc. 30, at 20-25. The proposed order, however, is more specific and states that "the concluding paragraph of the Declaration of Jevin West, ¶ 23, shall be excluded from consideration in resolving Plaintiffs' Motion for Preliminary Injunction." Doc. 33, at 1.

I. **THE DECLARATIONS SATISFY THE RELAXED EVIDENTIARY STANDARDS APPLICABLE TO PRELIMINARY INJUNCTIONS.**

Plaintiffs do not challenge either professor's qualifications. And, as discussed below, their testimony would satisfy the *Daubert* standard. But it is doubtful whether that standard even applies at this stage in the case.

Plaintiffs recognized as much earlier in the case. In their preliminary injunction brief, they emphasized the relaxed evidentiary standard that applies when ruling on preliminary injunction motions. Plaintiffs noted that "because of 'the haste that is often necessary' to prevent irreparable injury, preliminary injunction 'procedures' are 'customarily' 'less formal' and 'evidence' 'less complete than in a trial on the merits.' *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)." Doc. 11, at 13. Indeed, Plaintiffs acknowledged that courts can consider evidence that does not strictly conform with the rules of evidence in deciding whether to grant a preliminary injunction: "A court may rely on the verified complaint's averments or other affidavits as evidence." *Id.* (citing *Doe v. S. Iron R-1 Sch. Dist.*, 498 F.3d 878, 880 (8th Cir. 2007) (verified complaint); *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir. 1983) (declaration)).

Plaintiffs now seek to rigidly apply Rule 702 and the *Daubert* standard. This position conflicts with the approach prescribed by the Supreme Court in *Camenisch* and previously—and correctly—offered by Plaintiffs. In the decades since *Camenisch*, a wealth of caselaw demonstrates the flexible approach that courts take in deciding preliminary injunction motions. For example, the Eighth Circuit has emphasized: "The haste with which preliminary injunction motions proceed and their limited purpose customarily

3

require the relaxation of procedural safeguards." *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985) (citing *Camenisch*, 451 U.S. at 395).

Relying on *Camenisch* and *Patterson*, trial courts in this Circuit exercise significant discretion over the evidence they choose to hear in a preliminary injunction setting. *McGriff Ins. Servs., Inc. v. Madigan*, No. 22-5080, 2022 WL 16709050, at *4 (W.D. Ark. Nov. 4, 2022). Objections that affidavit evidence is "hearsay, speculative, or irrelevant . . . go to the weight, not the admissibility, of the evidence." *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1206 (D. Minn. 2007). Other circuits have gone a step farther, holding that "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003); *accord Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). Likewise, federal district courts in other Circuits have relaxed the *Daubert* requirements for preliminary injunction proceedings, treating *Daubert* as "more instructive on the weight of the evidence rather than its admissibility at this procedural posture." *Defs. of Wildlife & S.C. Coastal Conservation League v. Boyles*, No. 2:22-CV-112, 2023 WL 2770280, at *2 (D.S.C. Apr. 4, 2023); *see also Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, No. 05-CV-329, 2008 WL 4453098, at *4 (N.D. Okla. Sept. 29, 2008); *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, No. 1:00-CV-01647, 2002 WL 34365244, at *2-3 (D.N.M. Sept. 30, 2002).

Although the Eighth Circuit has not explicitly identified the standard applicable to expert testimony in the preliminary injunction context, it has addressed the issue in the analogous bench-trial context. "When the district court sits as the finder of fact, there is

4

less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (internal quotation marks omitted); *accord Am. Dairy Queen Corp. v. W.B. Mason Co., Inc.*, 543 F. Supp. 3d 695, 721 (D. Minn. 2021); *Keller Indus., Inc. v. Eng'g & Constr. Innovations, Inc.*, No. 21-CV-2218, 2024 WL 198999, at *12 (D. Minn. Jan. 18, 2024). This relaxed standard is appropriate because the "main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). Thus, courts deciding a matter without a jury should resolve any doubts about the utility of expert testimony in favor of admissibility. *Am. Dairy Queen Corp.*, 543 F. Supp. 3d at 721. Instead of exclusion, "the better answer is to decide what weight to give" the expert's opinions. *Keller Indus., Inc.*, 2024 WL 198999, at *12.

Under these relaxed standards, the Court may consider Professor Hancock's and Professor West's declarations when ruling on Plaintiffs' preliminary injunction motion. Indeed, as shown below, the declarations would be admissible even if *Daubert* applied. *See infra* Part II. But, because Plaintiffs' entire motion to preclude is premised on the incorrect legal principle that district courts rigidly apply the *Daubert* standard at the preliminary injunction stage, the Court should deny the motion.

## II. EVEN IF RULE 702 APPLIES, THE EXPERT DECLARATIONS ARE ADMISSIBLE.

Even assuming that Rule 702 applies to expert testimony at this juncture, the Court should deny Plaintiffs' motion. Rule 702 calls for the "liberal admission" of expert testimony. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

5

Rejecting testimony is the exception, not the rule. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019). Accordingly, doubts regarding the usefulness of an expert's testimony are resolved in favor of admissibility. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

Under *Daubert*, expert testimony must generally meet three prerequisites: (1) the evidence must be useful in deciding factual issues; (2) the witness must be qualified; and (3) the evidence must be reliable. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Plaintiffs' sole challenge is to the third requirement.

### A. Professor Hancock's Citation Errors Do Not Merit Excluding His Entire Declaration.

To justify exclusion, Plaintiffs rely on Professor Hancock's original declaration erroneously citing an AI-hallucinated journal article. *See* Doc. 30, at 4-8. After Plaintiffs identified this issue, Professor Hancock re-reviewed his original declaration and confirmed that it contained three citations that were likely hallucinated by GPT-4o. *See generally* Doc. 39. Professor Hancock has corrected the citation errors in an amended declaration, and he has explained how the errors likely occurred through his use of GPT-4o. *Id.* As Professor Hancock explains, the citation errors do not affect the substance of his testimony. *Id.* And the amended declaration adds no new material and no longer contains the errors. *Id.*; *see generally* Doc. 39-1.

Experts make mistakes. And mistakes—even as to important facts or issues—do not typically render the expert's opinion inadmissible. *See, e.g.*, *Hays v. Blackpowder Prods., Inc.*, No. 3:17-325, 2020 WL 425646, at *3 (E.D. Ark. Jan. 27, 2020). Generally, the factual

6

basis of an expert opinion goes to weight, and the expert's testimony should be excluded "only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the [factfinder]." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) (internal quotation marks omitted).

For that reason, courts in this and other circuits have repeatedly held that an expert's errors, especially when later corrected, are not grounds for exclusion. *See, e.g.*, *Hays*, 2020 WL 425646, at *3; *United States v. Moore*, No. 1:23-cr-47, 2024 WL 4379845, at *8 (S.D. Ohio Oct. 3, 2024); *United States v. Wrensford*, No. 2013-0003, 2014 WL 3715036, at *15, 18 (D.V.I. July 28, 2014); *I.B.E.W. Loc. Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 2265269, at *2 (E.D. Pa. June 3, 2008); *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 WL 2356292, at *2-3 (E.D. La. July 28, 2009); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 39-40 (D.D.C. 2004). Indeed, "[t]here is no stigma" in correcting an error, as correction instead strengthens the quality of the expert's testimony. *Crowley v. Chait,* 322 F. Supp. 2d 530, 540 (D.N.J. 2004). And the mere fact that an expert made a mistake, "particularly where the error [is] found and rectified," is not grounds for finding the expert's opinion unreliable. *Wrensford*, 2014 WL 3715036, at *15. Rather, identifying and correcting such errors is "one of the very purposes of" the *Daubert* inquiry. *Id.* at *15-16.

In light of these principles, the Court should consider Professor Hancock's amended declaration rather than exclude it wholesale. Exclusion would run contrary to the purpose of Rule 702, *Daubert*, and the caselaw interpreting the contours of both. *See I.B.E.W. Loc. Union 380 Pension Fund*, 2008 WL 2265269, at *2 (stating identification and correction

7

of errors is one of the purposes of the *Daubert* inquiry); *see also Hartley*, 310 F.3d at 1061 ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the [factfinder] must such testimony be excluded.") (citations omitted). Indeed, courts will decline to exclude erroneous expert testimony even when it pertains to a pivotal fact or changes the expert's analysis. *Cf. Wrensford*, 2014 WL 3715036, at *15-18 (holding that even if the expert's error constituted a "major mistake," it was caught and addressed in a subsequent report and thus the error was not grounds for exclusion); *Hays*, 2020 WL 425646, at *3 (holding expert testimony admissible in a products liability case even after the expert's factual mistake led the expert to erroneously rule out one potential cause of the accident). And unlike those foundational types of errors, the substantive points for which Professor Hancock inserted erroneous cites are supported by literature already included in the declaration and other literature in the field. Doc. 39, at ¶¶ 15-20.

Plaintiffs rely on a few other cases involving hallucinated caselaw citations, *see* Doc. 30 at 8, but those cases are distinguishable in two important ways. First, as just noted, the factual propositions for which Professor Hancock provided the mistaken citations are well-established in his field and are readily confirmed by other sources already cited in the original declaration, as well as by additional sources that Professor Hancock has provided. *See* Doc. 39, at ¶¶ 1-3; *see also* Doc. 39-1, at ¶¶ 19, 21, 25.

Second, in Plaintiffs' cases, litigants or attorneys submitted hallucinated caselaw to the court in briefing material and did not promptly acknowledge the errors. *See, e.g.*, *Mata v. Avianca, Inc.*, No. 22-CV-1461, 2023 WL 3696209, at *1 (S.D.N.Y. May 4, 2023) (describing how when attorney was ordered to file a copy of a suspected hallucinated

opinion, he responded by filing a document that was itself fictitious). Here, by contrast, Professor Hancock promptly acknowledged and explained how the errors likely occurred. This difference renders Plaintiffs' comparison inapposite.

In sum, Professor Hancock's mistakes are best addressed when the Court determines the weight to afford Professor Hancock's testimony.

### B. Professor Hancock and Professor West Satisfy Rule 702's Criteria for Experts.

In support of their motion to exclude, Plaintiffs assert that the expert declarations are lacking in methodology. Plaintiffs do not contest that the experts are qualified, that their declarations address a subject matter on which an expert can assist the Court, or that the testimony is relevant to the facts of this case. Indeed, as noted above, Plaintiffs challenge to Professor West's declaration appears to be limited to a single paragraph. *See supra* at 2 n.2; Doc. 33, at 1.

In attacking the declarations' methodology, Plaintiffs overlook that Rule 702 contemplates at least two types of expert testimony. First, experts may apply specialized principles and methods to the facts of the particular case. Fed. R. Evid. 702 adv. comm. note (2000). Second, experts may also educate the factfinder about general principles, without ever attempting to apply these principles to a case's specific facts. *Id.*; *see also United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011). Such testimony is appropriate when a case's issues require an expert to educate the factfinder about general principles of complex topics that are not within the knowledge or experience of lay people. *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 931 (D. Minn. 2020). In such

9

circumstances, Rule 702 simply requires that "(1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." Fed. R. Evid. 702 adv. comm. note (2000); *see also United States ex. Rel. Miller v. Bill Harbert Int'l Constr. Co.*, 608 F.3d 871, 894 (D.C. Cir. 2010) (rejecting challenge to background expert based on arguments that testimony was "too generic[] and based too heavily on assumptions rather than analysis of the actual evidence").

Here, Plaintiffs' arguments about the experts' lack of a methodology are irrelevant because Professors Hancock and West are educating the Court about general principles without applying those principles to the specifics of this case. Alternatively, even if some methodology is required, the experts' declarations satisfy methodology requirements for social science testimony.

> **1.     Plaintiffs' attacks on a lack of methodology are meritless because Professor Hancock and Professor West are providing general background principles.**

Professor Hancock's and Professor West's declarations fit squarely into the Rule 702 category of educating about general principles. Still, Plaintiffs argue that portions of the declarations should be excluded because they are not the product of a "reliable methodology." Doc. 30, at 20. But no methodology is necessary when an expert is providing a court with background facts about a scientific field.

Certainly, if an expert applies a methodology to a particular case, that method must be reliable. But when an expert presents general principles to educate the Court about a field without reaching case-specific conclusions, methodology is unnecessary because the

10

expert is not conducting any analysis. *Cf. Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005) (recognizing methodology comes into play when experts "bridge the analytical gap between general principles and particular conclusions"), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006).

This is exactly what Professor Hancock and Professor West did. Their declarations consist of explaining how deepfakes are created and spread, identifying the psychological impacts that deepfakes have, and describing the characteristics that make counterspeech an inadequate response. But neither expert purports to then apply a methodology to reach case-specific conclusions. The paragraphs identified by Plaintiffs as supposedly conclusory demonstrate this point. For example, Plaintiffs take issue with paragraphs 26-28 of Professor Hancock's declaration. But those paragraphs describe the results of studies about labeling deepfakes and the creation of false memories. Contrary to Plaintiffs' assertion, neither contains any case-specific conclusions, let alone supposed "de facto conclusions of law." Doc. 30, at 4. The same is true of the other paragraphs identified by Plaintiffs.

The closest the experts come to reaching case-specific conclusions that would require a methodology is in the concluding (as in final) paragraphs of their respective declarations. And even in those paragraphs the experts are still providing general background information. Professor Hancock does not speak to the particularities of Minnesota's electoral deepfake law at all; instead he only summarizes what already naturally flows from the information he has already provided—that regulations specifically targeting the production and dissemination of electoral deepfakes are critical to preserving democratic institutions. Doc. 39-1, ¶¶ 31-32. Professor West does specifically discuss

11

Minnesota's statute. Doc. 24, ¶ 23. But he does so in the context of speaking generally about the insufficiency of other responses to electoral deepfakes. Professor West does not reach any of the sort of case-specific conclusions that would implicate *Daubert*'s methodology requirement.

Plaintiffs' cited cases are not to the contrary. *Daubert* and *Kumho Tire* both involved experts who reached conclusions, as opposed to merely providing background principles. *Daubert*, 509 U.S. at 583 ("These experts had concluded that Bendectin can cause birth defects."); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 143 (1999) ("Carlson concluded that a defect in [the tire's] manufacture or design caused the blowout."). The same is true of the circuit and district court cases cited by Plaintiffs. *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 969 (8th Cir. 2023); *Wholesale Grocery Prods.*, 946 F.3d at 999; *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 634-35 (8th Cir. 2007); *United States v. Pon*, 963 F.3d 1207, 1215-16 (10th Cir. 2020); *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 233 (D. Minn. 2020).

Plaintiffs' cited cases actually cut the other way. *Lancaster* makes clear that *Daubert*'s concerns with methodology arise when the reasoning or methodology "properly can be applied to the facts in issue." 75 F.4th at 969 (internal quotation marks omitted). And in *Pon*, although the district court had excluded an expert's case-specific conclusions, it permitted testimony like Professor Hancock's and Professor West's declarations that educated the factfinder about "general concepts" without reaching conclusions. 963 F.3d at 1220. This Court should do the same in this case.

12

### 2. To the extent that the experts reach conclusions, those conclusions are based in accepted social science methodology.

Insofar as Professor Hancock or Professor West could be understood as reaching conclusions, they reached those conclusions using methods that are well-accepted within the social sciences. Plaintiffs appear to fault the experts for reaching conclusions that did not stem from the generation of "testable hypotheses subjected to the real world crucible of experimentation, falsification/validation, and replication." Doc. 30, at 10. But, to the extent the experts' declarations contain case-specific conclusions, those conclusions are based on the experts' surveying the relevant scientific literature and then applying that literature to this case. Such a methodology is well-accepted by courts when dealing with social science testimony like the experts' declarations in this case.

An expert does not necessarily have to conduct quantitative testing so long as there are other factual bases for the expert's conclusions. *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 826-27 (D. Minn. 2011). Such information may include a review of the professional literature on a topic followed by the application of that literature to the specifics of the case, even if such application "does not easily admit of rigorous testing and replication." *Lees v. Carthage Coll.*, 714 F.3d 516, 524-25 (7th Cir. 2013).

The experts' declarations in this case conform to this well-accepted methodology. Both expert declarations make clear how their opinions are supported by the experts' vast experience in their respective fields and the relevant field literature. Both experts identify how their own research and the research of others impacts this case. And both experts'

13

opinions identify how that research naturally leads to (what Plaintiffs characterize as) their conclusions. Moreover, to the extent there is any doubt about the sufficiency of the experts' methodologies, such doubts once again go to the weight, not the admissibility of the declarations. "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance . . . must such testimony be excluded." *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011) (internal quotation marks omitted). This is particularly so when a judge is serving as both factfinder and gatekeeper of evidence. *Grant ex rel. United States v. Zorn*, 107 F.4th 782, 794 (8th Cir. 2024); *see also supra* at 4-5. In light of the experts' clear identification of the studies that support their conclusions, their declarations come nowhere close to meeting this exclusionary bar.

### 3. Factual evidence regarding the inefficacy of counterspeech is not a legal conclusion.

Plaintiffs also argue the Court should exclude portions of the expert declarations because they contain supposedly legal conclusions regarding the insufficiency of counterspeech in combatting electoral deepfakes. Doc. 30, at 22-25. This argument fails because the sufficiency of counterspeech is necessarily a question of fact, not a question of law.

Plaintiffs take the position that "binding caselaw" dictates that counterspeech is sufficient to address electoral deepfakes. The Eighth Circuit has expressly rejected this reasoning. In *281 Care Committee v. Arneson*, the court rejected the state's argument that counterspeech was insufficient because the state had not "offered persuasive evidence to dispel the generally accepted proposition that counterspeech may be a logical solution to

14

the interest" in avoiding political falsehoods. 766 F.3d 774, 793 (8th Cir. 2014). The possibility that the state could have offered "persuasive evidence" necessarily means that counterspeech is not, as a matter of law, always a sufficient response. *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (recognizing harms that "cannot easily be repaired by counterspeech").

And in this case, Minnesota has offered such persuasive evidence. Professor West explains how at present, digital tools are unable to definitively differentiate between deepfakes and real media. Doc. 24, ¶ 20. He also explains how such deepfake content is designed to go viral and, once spread, factchecking is ineffective because many viewers of the original video may never see the correction. *Id.* at ¶¶ 16, 19-21. And Professor Hancock explains how the psychological phenomena of false memories, the illusory truth effect, and the liar's dividend all flow from the proliferation of deepfakes in ways that cannot be adequately addressed by counterspeech. Doc. 39-1, at ¶¶ 24-30. This factual evidence demonstrates—certainly at the preliminary injunction stage—that counterspeech is insufficient to vindicate Minnesota's interests in preventing the harms caused by electoral deepfakes. As a result, the Court should reject Plaintiffs' arguments that the experts' declarations should be excluded as legal conclusions.

### III. PLAINTIFFS' REMAINING ARGUMENTS GO TO THE WEIGHT, NOT THE ADMISSIBILITY, OF THE DECLARATIONS.

In addition to addressing the admissibility of the experts' declarations, Plaintiffs devote significant argument to responding to the substance of the declarations. Doc. 30, at

15

25-34.[3] Such arguments go to the weight, not the admissibility, of the declarations, and they are meritless in any event.

First, Plaintiffs note that in 2021, Hancock was more equivocal about the harms of deepfakes. Doc. 30, at 25-27. But this shift is unsurprising. The barrier to entry for producing deepfakes has been greatly reduced in recent years. Doc. 39-1, ¶ 17; Doc. 24, ¶ 9; *see also* Doc. 39, ¶ 6 ("The literature has increased dramatically with the release of ChatGPT in November 2022, [] which has accelerated the development of tools that can be used to create deepfakes."). Now that their production has proliferated, Professor Hancock can naturally speak with more conviction on the harms that they cause.

Second, Plaintiffs selectively cite Professor West's 2020 discussion of using counterspeech to respond to misinformation generally. From this, they draw the conclusion that Professor West actually favors counterspeech as a means of addressing deepfake information specifically. Doc. 30, at 27-30. Not so. As Professor West states in his declaration, deepfakes are difficult to combat with traditional interventions like counterspeech. Doc. 24, ¶¶ 20-22. Thus, Professor West's pronouncements about misinformation generally are of no import.

Third, Plaintiffs argue that the Attorney General exaggerates the conclusions to be drawn from the expert declarations. Doc. 30, at 30-34. They primarily argue that various

---

[3] This portion of Plaintiffs' brief is focused on the merits and should have been included in Plaintiffs' reply brief in support of their preliminary injunction motion. Plaintiffs used 11,979 of their allotted 12,000 words in their preliminary injunction briefing. Doc. 11.1, at 2; Doc. 28.1, at 1; LR 7.1(f)(1)(B). They could have sought leave from the Court to expand that limit to submit contrary evidence or argue against the conclusions that should be drawn from expert declarations. Plaintiffs chose not to do so.

16

psychological phenomena that result from exposure to deepfakes are not unique to deepfakes but rather have also been shown to flow from exposure to traditional deceptive media. *Id.* at 30-32, 34. These arguments ignore the novelty and power of deepfakes, and the academic literature about how deepfakes create uncertainty about the truthfulness of content and "erode confidence and trust in our information systems." *See, e.g.*, Doc. 24, ¶¶ 8, 22 (describing novelty of deepfakes and why they are difficult to counter).

Plaintiffs also dispute that the declarations establish the inadequacy of counterspeech for deepfakes, asserting that neither expert explicitly states this conclusion. Doc. 30, at 33-34. As an initial matter, Plaintiffs are wrong: Professor Hancock expressly states that "counterspeech [is] insufficient to address . . . deepfakes," and Professor West recognizes that a marketplace-of-ideas response (i.e. counterspeech) is insufficient for a variety of reasons. Doc. 39-1, ¶ 32; Doc. 24, ¶ 23. Moreover, even if the experts had not reached these conclusions, they obviously flow from the background information that Professor Hancock and Professor West provide. Plaintiffs have presented no evidence disputing that, once a deepfake is unleashed on the world, it is unlikely that everyone whose decisionmaking is impacted by the deepfake will see any counterspeech response. Doc. 24, ¶¶ 14-17, 19-22. And if counterspeech cannot reach viewers, it necessarily follows that such speech will not adequately combat the deepfake.

## CONCLUSION

Even if Rule 702 applies in its strictest form, Plaintiffs' arguments go to the weight, not the admissibility, of the expert declarations. The Court should deny their motion to exclude.

17

Dated:  December 6, 2024 　　　　　　　　Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

<u>/s/ **Pete Farrell**　　　　　　　　　</u>
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANGELA BEHRENS (#0351076)
ALLEN COOK BARR (#0399094)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
angela.behrens@ag.state.mn.us
allen.barr@ag.state.mn.us

ATTORNEYS FOR KEITH ELLISON

18