UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

-----------------------------------------------------------

Christopher Kohls and Mary   )  File No. 24-cv-3754
Franson,                )        (LMP-DLM)
                        )
     Plaintiffs,      )  Courtroom 3C
                      )  St. Paul, Minnesota
vs.                )  December 17, 2024
                      )  10:00 a.m.
Keith Ellison, in his official  )
capacity as Attorney General    )
of Minnesota, and Chad Larson,  )
in his official capacity as
county attorney of Douglas
County,

     Defendants.

-----------------------------------------------------------

BEFORE THE HONORABLE LAURA M. PROVINZINO
UNITED STATES DISTRICT COURT JUDGE
**(CIVIL MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

**APPEARANCES**:

For the Plaintiffs:              Hamilton Lincoln Law Institute
                                 Michael Bednarz, ESQ.
                                 1440 West Taylor Street
                                 Suite 1487
                                 Chicago, IL 60607

                                 Upper Midwest Law Center
                                 12600 Whitewater Drive
                                 Suite 140
                                 Minnetonka, MN 55343

For Defendant Keith              Office of the Attorney General
Ellison:                         Peter Farrell, ESQ.
                                 Angela Behrens, ESQ.
                                 Allen Cook Barr, ESQ.
                                 445 Minnesota Street
                                 Suite 900
                                 St. Paul, MN 55101-2127

For Defendant Chad               Squires, Waldspurger & Mace,
Larson:                          P.A.
                                 Kristin Nierengarten, ESQ.
                                 Zachary Cronen, ESQ.
                                 333 South 7th Street
                                 Suite 2800
                                 Minneapolis, MN 55402

Court Reporter:                  Lynne M. Krenz, RMR, CRR, CRC
                                 United States Courthouse
                                 Suite 146
                                 316 North Robert Street
                                 St. Paul, Minnesota 55101

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  All right.  First I want to call the case.  Christopher Kohls and Mary Franson, plaintiffs, versus Keith Ellison, in his official capacity as Attorney General of Minnesota, and Chad Larson in his official capacity as County Attorney of Douglas County, defendants.  It's case number 24-cv-3754.

So first I'd like to have appearances on behalf of the plaintiffs.

MR. BEDNARZ:  For the plaintiffs, Frank Bednarz from Hamilton Lincoln Law Institute.

MR. FARRELL:  And James Dickey from the Upper Midwest Law Center, Your Honor.

THE COURT:  Great.  Good morning.  And on behalf of the defendants.

MR. FARRELL:  For Defendant Attorney General Ellison, Peter Farrell from the Minnesota Attorney General's Office.

THE COURT:  Good morning.

MR. BARR:  Allen Cook Barr from the Minnesota Attorney General's Office.

THE COURT:  Great.

MS. BEHRENS:  Angela Behrens on behalf of Defendant Ellison.

THE COURT:  Great.  Welcome to you.

And on behalf of Douglas County.

MS. NIERENGARTEN:  Kristin Nierengarten on behalf of Douglas County from Squires Waldspurger and Mace.

THE COURT:  Great.

MR. CRONEN:  And Zachary Cronen on behalf of Defendant Larson as well.

THE COURT:  Great.

Well, we're principally here on behalf of a preliminary injunction motion filed on behalf of the plaintiffs.  But in the process of the briefing for this some additional issues arose, including plaintiffs filing a motion to exclude expert testimony and defendants filing a motion to file an amended expert declaration.

So I think it makes sense to hear the expert issues first and then we'll reserve the bulk of our time for oral argument for the preliminary injunction.

As I look at everything that's been filed, I think my inclination is to rely on the affidavit or the declaration provided from Professor West.  I think what is the more relevant issue for me to learn about from you today is that for Professor Hancock.

And so I'll invite plaintiffs' counsel to first address that, your motion to exclude the expert testimony and the sanctions that you're seeking.

So I'll invite you up to the podium for that, Mr. Bednarz.

MR. BEDNARZ:  Thank you, Your Honor.

With regard to Professor Hancock.  We believe that our motion to exclude is even stronger than what originally filed because in his declaration where he explains how the hallucinated citations wound up in his final report.  He explains that he basically gave an outline or a bullet point list of points to ChatGPT, the latest version of ChatGPT, to draft his declaration and then he cut and pasted the output into the declaration for the relevant paragraphs.

So in these particular paragraphs he included, apparently based on his declaration, a note that said a cite.  He says it was a note for himself to include a citation, but ChatGPT being a large language model is eager to do whatever is asked of it, even if it can't find what's asked of it, and this is why it often outputs hallucinations.

And so in the output for these paragraphs, apparently based on his declaration, it included citations to articles that do not exist and Professor Hancock avers in his declaration that he then thoroughly edited the output. But, Your Honor, we submit that it could not have been that thorough given that Professor Hancock is holding himself out as an expert in this field and is aware of publications and

ought to have known that these articles simply don't exist, so.

THE COURT: Didn't he indicate, though, that the actual substance of what he was providing in the declaration was accurate?

I agree these were hallucinated citations. I'm troubled by that. I'm trying to figure out what the proper remedy for that is. But that the ultimate opinions and expert testimony he was providing didn't change.

MR. BEDNARZ: Well, Your Honor, the process of drafting it I think shows that the substance of it is unreliable because it's based on his vague directions given to ChatGPT and this is what he wanted to write in the report and especially in the concluding paragraphs where it name checked several legal terms of art that fit right into Defendant Ellison's arguments. And these were woven together and in the motion to substitute they simply change out the citations but it doesn't change the process by which the declaration was originally composed, which is through Large Language Model.

THE COURT: So can I just excise those three paragraphs? Is the rest of it still reliable enough for me to use that in my assessment for your preliminary injunction?

MR. BEDNARZ: No. Certainly not with the

conclusory paragraphs, especially the last paragraph.  But we cite a few other examples in Professor Hancock's declaration where he makes essentially political opinions that are not actually supported by his citation.

And I should also point out that one of the substitutions he made in the report he replaced a hallucinated article with an op-ed that he wrote along with a co-editor that was a special guest editor for an edition of a journal.  And in the editorial he says that the videos are equally likely to mislead as text.  And he's citing it for completely -- this is completely the reverse proposition in his declaration.  So that paragraph is not supported by his op-ed.  His op-ed says the reverse.  And actually a lot of his publication history is based on the idea that people are more likely to believe what they read online because there's no verbal cues.  There's no things to distract people and throw them off.  They look at the text and they tend to believe it.  This is what his own research shows.  And so, of course, in his summary of the research up to that point in his op-ed, he says that people are equally likely to be misled.

And this is part of, you know, I don't want to get into the underlying merits too much of this.  But the idea that these are not unprecedented.  That there's lots of ways that people lie and there always been in a political

context, you know, you can put together on a word processing program, you know, letters that purport to be about George W. Bush's military service in Vietnam and a lot of very important people believe that because it's text.  It looks like it's an official letter and you don't have access to it.  You can just say, well this thing leaked, or whatever, and people tend to believe things that are generated through very crude means and there isn't an easy way to identify errors on something that somebody says is leaked out of a proceeding somewhere.

THE COURT:  But you did identify those errors.

I guess the challenge before the Court now in a preliminary injunction posture is there isn't a record, so, you know, you're asking for pretty extraordinary relief without a record, so I do have these expert declarations before me.

You know, I guess what is the relief you're actually seeking?  I mean, doesn't it just go to weight versus admissibility?  Can I rely on everything but those three paragraphs or what is it that you're seeking in your motion to exclude?

MR. BEDNARZ:  Well, as we point out in our reply, a lot especially of the West declaration is genuine background material and we're not asking for that material to be excluded.  It's talking about how deepfakes exist.

Large Language Models have advanced recently in the last couple of years are much cheaper, much more available.

But the conclusions where in the last paragraph of the Hancock declaration, for example, he says that counterspeech is insufficient for counteracting deepfakes.

Your Honor, I mean, I humbly submit that we have shown in this very case that counterspeech is still effective to point out falsehoods that are generated by AI.

There's not any support in the proceeding paragraphs. There's different paragraphs that say people can be deceived by being exposed to a large volume of fake information. But these just replicate studies that previously were done that show that when people are bombarded with fake information they tend to think, oh, well maybe there's something there. Where there's smoke there's fire. That kind of thing. And it's not fundamentally a different kind of problem than is one that has always happened in democracies, you know, going all the way back to the ancients, Ancient Greece, parodies, satire, fake information. When people can be persuaded by things, they'll tend to shade things in their favor. And that's what people do and sometimes, intentionally or unintentionally, they'll cross the line into something that is fake.

And so this problem that we're confronting right

now, is not qualitatively different.  So the background material showing that people, you know, can be worn down by being bombarded with fake information, it's similarly true with other forms of lies.  And this is why the concluding paragraphs don't have support from anything that precedes it.

THE COURT:  So it sounds like you're making two arguments there.

MR. BEDNARZ:  Yep.

THE COURT:  That I can't rely on the concluding paragraph because it's either unsupported by what else is in the declaration or is conclusory or maybe calls for a legal conclusion.

But are you also saying that -- is the whole declaration so tainted and unreliable because of those false citations that I can't rely on it at all?  I guess I'm asking what exactly your relief you're seeking from the Court as it relates to the motion to exclude.

MR. BEDNARZ:  Well, with Hancock we think the whole thing has to be excluded because it was composed in the first draft by a Large Language Model, which is not qualified to be an expert in anything because it has a tendency to make stuff up, as we have demonstrated in this case.

So for the entire Hancock declaration, it ought to

be excluded.

Now when we're talking about the concluding paragraph of the West declaration where he says the market of ideas no longer works. That's just an ipse dixit assertion by an expert. It doesn't have -- it doesn't have preceding evidence that supports it. And contrary to what Defendant Ellison argues, it is case specific. It's saying that applied to this law the idea of deepfakes are somehow qualitatively different such that the Court should discard *281 Care Committee*. This is the kind of conclusion that's applying to the facts of the case that is not background information and that's why separately the conclusory paragraphs from both the declarations, which is only one paragraph in the West declaration, as Defendant Ellison accurately said, ought to also be excluded.

THE COURT: Okay. Thank you. I'm going to call Mr. Bednarz up to address those two motions.

Was there anything else you wanted to say as it relates to the expert declarations?

MR. BEDNARZ: I would just add that, again, ChatGPT is not an expert. Not qualified as an expert. Should not be relied on as expert testimony.

THE COURT: Great. Thank you. Mr. Farrell.

MR. FARRELL: How's that?

COURT REPORTER: Could I just remind counsel to

talk into the microphone.

MR. FARRELL:  How's that?

COURT REPORTER:  Good.  Thank you.

MR. FARRELL:  Good morning, Judge Provinzino.

THE COURT:  Good morning.

MR. FARRELL:  I appreciate the opportunity to address the expert issue first.

I want to make two points about -- two main points about the expert issues.

As per Professor Hancock, the admitted and now corrected errors in his original declaration go to the weight and credibility of his testimony.  And as for Professor West, the single paragraphs that the plaintiffs seek to exclude can and should be considered at this stage of the case.

Let me start with Professor Hancock.  And before I go to some of the substance, I just want to start with an apology to the Court and counsel that this issue occurred in the first place and that it has consumed so much time and resources.

We did rely on Professor Hancock to draft the substance of his declaration and to identify the academic literature that supported his declaration.  That said, we didn't catch this error and I want to acknowledge that.

I do know that Professor Hancock feels awful and

so do I, so I just want to start with that.

THE COURT:  Thank you.

MR. FARRELL:  In terms of the substance and with that background in mind, expert errors like this, and this was an error, typically do go to weight and credibility, particularly at this stage of the case.

At the preliminary injunction stage, to the extent *Daubert* applies, it's relaxed.  Experts make errors all the time, typically in a later stage of the case, and when that happens, experts correct them.  And that's what's happened here.

So what Professor Hancock's done is explained how the AI-hallucinated citations worked its way into his declaration.  He has corrected them and he has explained how the substantive points in the problematic paragraphs, paragraphs 19 and 21, are backed up by other literature cited in the original declaration and other material that he identifies in his explanatory declaration at ECF 39.

THE COURT:  But why don't those AI-hallucinated citations in there just taint the reliability of the whole declaration?

MR. FARRELL:  From our perspective, Your Honor, we think the most salient point is that the substance of what's in those paragraphs was supported by other material that was in the original declaration.  We readily acknowledge that

the fact that the AI-hallucinated citations were in the original declaration and that Professor Hancock overlooked them.  Sloppy and careless.  But what we think what that goes to is the weight.  We don't think it taints the entire declaration.  We've explained why we think under the equitable excusable neglect standard the declaration still comes in.

All that said, and I just want to be clear about this because we made this point in our reply -- or, excuse me, in our response to the motion to exclude, if the Court has any doubts about -- or any doubts about Professor Hancock's explanation or feels like the errors in the original declaration taint the entire thing, we have no objection to the Court excluding the declaration.  Obviously that has an impact on our case.  We do have a duty to defend the constitutionality of state statutes and Professor Hancock's expertise was important to that defense.  But we do think that overall the errors should be factored into your assessment of Professor Hancock's credibility but we do recognize that if the Court is uncomfortable with either Professor Hancock's process or just the existence of the AI-hallucinated citations in general, then the Court should just exclude the declaration.

THE COURT:  Okay.

MR. FARRELL:  And we'll move on.

THE COURT:  Okay.  I appreciate those arguments, Mr. Farrell.  I think at a minimum I have to at least exclude those three paragraphs.  It may have to be more than that.  I was just wondering how that impacts the State's case.

MR. FARRELL:  If you exclude the three paragraphs or even more, the impact on our case, I think the biggest impact is Professor Hancock's unique expertise is on the psychological consequences of deepfakes.

THE COURT:  Right.

MR. FARRELL:  Professor West speaks to some of the same issues but he's coming at them from a slightly different perspective.  So if you do exclude those paragraphs or exclude the entire thing, I think that's where the impact is felt in terms of our defense.

I don't want to get into the merits.  We do think that we have very strong standing arguments that may allow the Court to sidestep all of these issues, so to speak, but that is where we think the impact would be felt.

THE COURT:  Okay.  Well, thanks for that argument.

MR. FARRELL:  Yes.

THE COURT:  We'll now turn to the preliminary injunction motion and that's the plaintiffs.

I'll invite the Mr. Bednarz up to address the preliminary injunction and then, Mr. Farrell, you'll have a

chance to respond.

MR. BEDNARZ:  Thank you, Your Honor.

Your Honor, the underlying statute here is very broad in its scope.  It covers all sorts of communications that have been generated through technical means and are perceived to be realistic as long as they're meant to affect the outcome of an election and within a fairly broad period of time before different elections.

And the fact of the matter is, Your Honor, that the mens rea requirement, the idea that it has to be intended to affect the outcome of the election, applies to all political speech.  So it's not really a protection at all.

*281 Care Committee*, I submit is the closest case on point, Your Honor, involves a similar statute that purported to outlaw false information that was disseminated for or against ballot measures.  Like this law, it had to be directed to changing people's votes.  Like this law, it was limited to 30 and 60 days before elections.  And the Court encyclopedically rejected many of the arguments that the defendants now make in support of this law.

THE COURT:  Well, let's start with, I think Mr. Farrell was alluding to it, does the Court even have standing to continue with this?  I'll acknowledge the statute seems fairly broad in its scope but isn't parody the

particular type of conduct that Mr. Kohls was engaging in not covered by the ambit of the statute?

MR. BEDNARZ: Well, a similar issue came up in *280 Care Committee* because the plaintiffs in that case, they submitted declarations that they were not engaged in false speech. They had no intention to engage in false speech. But the problem is is that there's an ambiguity about what is false speech in a political arena.

The same thing applies here. The statute does not provide any exception for parody, Your Honor. It says it has to be realistic. That's the determination now. The Attorney General argues that realism excludes parody but the drafters of the law didn't see that this way.

When it came up before the Senate, Senator Neu Brindley was asked, Well, doesn't this cover Saturday Night Live because that's nonconsensual, they're lampooning politicians? And her answer was not, well, no, not parody's accepted. Her answer was, Oh, but Saturday Night Live, it depends on performers physically imitating the politicians they're lampooning and that's why that that should be fine.

And when the statute -- when the legislators want to amend the statute to only cover videos saying that people commonly have campaign fliers that show, you know, candidates, you know, as accepting stacks of money or shredding in a shredder or something that says "campaign

promises" and stuff like that and people understand that this is the kind of marketing that politicians make when they're making fun of their opponents. And the sponsor of the bill cited an example which was, in fact, a parody.

He cited an example of images of Donald Trump being arrested that were originally posted on social media with the comment, "Creating images of Trump being arrested while waiting for Trump to be arrested."

THE COURT: But doesn't the reasonable person, that objective standard, it has to be so realistic that a reasonable person would believe it? I mean, doesn't that take parody outside of the ambit of the statute?

MR. BEDNARZ: Your Honor, it doesn't. And the reason for that is is that I think that, for example, Senator Amy Klobuchar is a reasonable person and on information noninformation and belief as Governor Gavin Newsom is. And the co-president of Public Citizen, Rob Weissman, he opined directly that people watching this specific video, the main video that caused the waves on social media and caused Governor Newsom to react, he said that this specific video is likely to be believed by most people watching it is real because it feeds into existing political prejudices of the audience.

THE COURT: Well, let's talk about that video. Because at least what's in the record before me indicates

that Mr. Kohls would regularly post on his YouTube videos the word "parody" in all capital letters.  So it was very clear to anyone accessing his YouTube videos that this was actual parody.  And then he even went one step further, right?  He had some disclaimer within the YouTube that the audios and visuals had been digitally altered.

So I guess, why does he have standing if his conduct and his speech is so clearly excluded from the statute to bring this preliminary injunction claim?

MR. BEDNARZ:  Well, those are those are required by the platform rules of YouTube owned by Google that when somebody posts something that's a parody it's against their terms of service not to label it as a parody.

X, formally known as Twitter, has a similar policy.  But Elon Musk posted the same video without saying parody.  It just says, "This is amazing."  And it was re-Tweeted by Plaintiff Franson.

THE COURT:  But isn't Plaintiff Franson then differently situated in the standing analysis than Mr. Kohls in light of not having that disclaimer on her speech?

MR. BEDNARZ:  Well, even on YouTube, lots of people watch YouTube videos from their Smartphones and they don't necessarily see the text that's posted accompanying the video.

YouTube will feed them sort of a stream of videos

and it sort of supposed to be in competition with Instagram and TikTok, platforms are like that where people can just scroll through lots of videos. And sometimes there's text that's sort of metadata on the video but most people don't actually end up seeing the text.

And I think, Your Honor, that's the reason that Klobuchar claimed that Elon Musk's reposting of it would be against the terms of service and unleash a wave of misinformation in the election, it's because it didn't have the disclaimer. And if you were viewing the video in a way that you wouldn't necessarily see the disclaimer, then I assume the opinion of Mr. Rob Weissman would hold that he would say that most people would, in the intended audience, would believe it.

And, you know, Professor West actually talks a little bit about this. About the culture of creating memes and things that feed into existing political tribes and they just sort of generate content and build upon each other and the gist of his argument is this is the future of social media, not necessarily of deepfakes. It's a creature of social media where people get into these groups and they start generating stuff and they get excited about it. And they're excited because platforms -- lots of social media platforms reward interaction with material.

And so threading the needle so that some people

can't tell whether it's fake or not or some people do believe it and then you can make fun of the people that believe it, it draws more attention to the original content. But it's also a feature of parody.

The reason that parody works as political commentary is that it closely imitates the thing that it's lampooning. And so by nature of being parody, it's going to feed into the same things that Professor West complained about, that that favors a viral engagement.

THE COURT: Assume at least one of your plaintiffs has standing to continue in this litigation. How -- could you address your likelihood of success on the merits at this preliminary injunction stage.

MR. BEDNARZ: The success of likelihood in the merits favors us because the statute itself does not contain any exception to parody. It turns on realism and *281 Care Committee.* It's almost encyclopedic in how it refutes a lot of Defendant Ellison's arguments in particular that the scrutiny level to be applied is a strict scrutiny because it's a speech of a political nature.

There's some back and forth in the briefing about *Alvarez* because there's only a plurality opinion in *Alvarez.* But *281 Care Committee* found that *Alvarez* is not actually the closest case on point. The closer cases on point are ones that involve raw political speech, which is a core

First Amendment value and interplays a strict scrutiny, whereas in *Alvarez* it's somebody lying about their receiving medals of honor.

Another thing that distinguishes that kind of speech from this speech is that there were clear facts of the matter about whether or not somebody had received it. You could look at the records that they actually receive a purple heart or whatever. Whereas, in political speech, whether something is true or not is often the whole subject of political debate and whether something is parody or not, Your Honor, I submit is a similar kind of thing. Is something that is that some people find completely fantastic and ludicrous, other people, who are still reasonable people, will believe it.

THE COURT: Now, *Alvarez* has several carve-outs and the State uses that to effect, but I guess I'm having trouble understanding the content of this sort of legally cognizable harm. What is the scope of that carve-out in *Alvarez*?

MR. BEDNARZ: Well, you know, the *Alvarez* carve-outs weren't successful because it didn't speak to a legally cognizable harm. The State had argued that, for example, that it would diminish the respect for the military or diminish the importance of valorous service and that kind of thing, if somebody could just go up and pretend to do it.

But this is the kind of amorphous interest that is -- is not a -- is not a compelling government interest and certainly isn't one that can withstand strict scrutiny.

THE COURT:  Well, even if I were to apply strict scrutiny isn't there some, you know, compelling argument that the State brings about the unique dangers of deepfakes, specifically?

MR. BEDNARZ:  No, Your Honor.

Defendant Ellison, he cites a few interests that they regard as compelling.  One is an analogy to defamation.

THE COURT:  Mm-hmm.

MR. BEDNARZ:  That doesn't actually work because, as admitted in Ellison's own briefing, the statute doesn't limit itself to something that actually harms somebody's reputation.  It just has to be false and has to be about a candidate that doesn't consent to it.  So defamation doesn't work.  It's not tailored to that interest at all.

Another one they cite is fraud.

THE COURT:  Fraud.

MR. BEDNARZ:  Now, there are -- there are cases about defrauding the voters, defrauding the listeners out of their vote.  And we articulate that difference.  That there is a compelling state interest to not deprive citizens of their rights to vote, not monkey with the machinery of

democracy.

So, in cases, for example, of the Biden robocall. It turns out that this is already criminal and it's criminal under Minnesota Statute that you can't deprive somebody of their vote by tricking them. And so this is not aimed toward that. It's not simply outlying deepfakes that are intended to deprive somebody of voting. They're sort of shifting it. They're saying, well, this is -- this is trying to trick somebody to vote differently. But that's the same thing that all speech about policy, all speech about politics is about. You're trying to persuade somebody to vote differently.

THE COURT: And I'll take your point that *281 Care Committee* is on point and that seems to suggest that counterspeech is the response. But the State's saying that's not effective in the context of deepfake. So how do you address that?

MR. BEDNARZ: Your Honor, the weight of that conclusion derives entirely from the Hancock report, specifically the last paragraph of the report where he says that counterspeech is insufficient.

The West report doesn't even support that. In the concluding paragraph, which we contend is conclusory in nature where he says the marketplace of ideas doesn't work, he doesn't say that this is necessary or that otherwise

there's nothing you can do about deepfakes.  He says, "One of the few mechanisms for countering these challenges is the Minnesota deepfake law."

Your Honor, the question is whether there's a less restrictive means.  And given that Professor West, along with co-author Carl Bergstrom, wrote a whole book called *Calling Bullshit* about how the best response is for the government to teach citizens that fakery exists online and how to vet and get providence for claims and to discern truth from fiction, Your Honor, I submit that that is the less restrictive means of combatting deepfakes.

You know, it exists even in Hancock's literature.  For example, he cites several times his op-ed and in his op-ed he summarizes the research in that report and describes a research that was done by, I think it's Wong in Korea, not the same Wong that was part of the hallucinated citation.

THE COURT:  Was the hallucinated cite, yeah.

MR. BEDNARZ:  But an actual citation about the success that South Korea had in teaching its citizens how to spot misinformation.

And like West says in the opening paragraphs in his book, that that's only a solution because these deepfakes will exist whether we want them to or not.  Whether the State prefers that this technology never

existed, it already exists, and so the best solution is one that prepares the citizenship to skeptically look at things that they see online and it, to the extent that people didn't know before that seeing a video is not the same thing as absolute proof, the solution is to tell them otherwise, to show them examples.

And so, Your Honor, I submit that even if the conclusion paragraph of West is credited, it does not support -- it does not support a distinction from *281 Care Committee.*

THE COURT:  Okay.

MR. BEDNARZ:  Also, another thing that's interesting about the concluding paragraph is that he says in the days prior to the internet and social media, Professor West sees the big difference now as being social media in having these groups that generate misinformation. Whether or not they're using any particular kind of deepfake technology is sort of besides the point.  The idea is that the social media rewards this kind of behavior.

So his --

THE COURT:  But deepfakes are a particular extreme example within social media, right?

MR. BEDNARZ:  I suppose that it is an example, but it's not -- it's not qualitatively different than previous kind of lies that were often told and often accepted and

often believed by people.  And the solution to that is to prepare people to encounter these things, to skeptically examine them and, if necessary, more speech to combat fake speech.

THE COURT:  So say I go with you, right, in terms of likelihood of success this is, I think, core political speech that needs to be subject to strict scrutiny and then I look at narrow tailoring.  You've raised some compelling arguments there.

But then when I look to the next factors for preliminary injunction, I'm really struggling with irreparable harm.

So I want you to address that piece for me.

MR. BEDNARZ:  Yeah.  Irreparable harm.  The problem here is that the past speech can still be prosecuted at any time by the county attorneys and by the Attorney General.

And a similar issue happened in *281 Care Committee*.  There was a preceding case that really we should have cited this as to *281 Care Committee II* for almost all of our citations because the original one found that there was standing even though the law was only effective for speech that was, you know, 60 days before a ballot measure and then, you know, by the time it's teed up, the time has passed and it wouldn't reoccur until the next election.

We're facing a similar thing here where the defendants, and for that matter, any other speakers that are subject to the Minnesota law can still be prosecuted for their past speech and so the statute of limitations hasn't run.

THE COURT:  I guess what Representative Franson is asking for, if I concede she has standing, for a really serious remedy that she's asking for a preliminary injunction with the strong medicine effectively and facially invalidating the statute.

So I am struggling with, wasn't she originally somebody who voted in favor of the statute in 2023?  I acknowledge she voted against it in 2024.  But if the harm from this was so serious, why are we only in court now with this preliminary injunction suit in September of 2024?

MR. BEDNARZ:  Well, as it says in the verified complaint, Representative Franson, she wasn't aware that the law would cover parody until July 29 in 2024.

Part of the reason that it was probably overlooked is that this law, the one we're challenging, was sandwiched between two very popular provisions that outlawed deepfake porn, which Franson herself strongly supported, and everybody did.

It might have also been lost in the shuffle.  I go in sort of gory detail about this in the complaint about how

there was a last-minute substitution of text and some of the State Senate wasn't going to concur in these last-minute amendments. They were sneaking in something that didn't get out of committee and then they agreed not to do that and all the supporters of the bill thanked them so much for removing this other component.

So I think that, Your Honor, that this as to Plaintiff Franson was probably just lost in the shuffle.

THE COURT: But the language was the same, right?

I mean, I guess part of irreparable harm I can look to concerns about delay but I can also look to whether this was a self-inflicted injury. And if she voted for this very language in the statute that she's now claiming is going to cause such injury, I'm struggling with whether I can find irreparable harm in light of those facts.

MR. BEDNARZ: Your Honor, if you wanted to reserve the question as to Plaintiff Franson, there is at least one component of the law that she didn't assent to, which is the new provision that was added to this year --

THE COURT: Okay.

MR. BEDNARZ: -- that disqualifies her from office.

We believe that you still would have a solid standing and no waiver arguments with respect to Plaintiff Kohls, who is unaware that this law existed. Not really in

tune with state politics in Minnesota.

But I understand that there's a kind of waiver or maybe it's analogous to Laches kind of thing. But even in that case, there should still be an injunction for Plaintiff Franson's benefit with respect to the disqualification provision that was only signed into law in, I think, May and only became in effect in July, I believe.

THE COURT: Anything else you wanted the Court to know?

MR. BEDNARZ: Your Honor, I think -- I wanted to just remark on the Hancock declaration.

I find it hard to believe that it's still not withdrawn. And it does play a significant part of Defendant Ellison's case, because it's the principal thing that they use to try to distinguish *281 Care Committee*, which otherwise rejects a whole slew of arguments. It rejects the argument about mens rea. It rejects the argument about the standard of review.

And, you know, they make a -- they make a suggestion that maybe *281 Care Committee* is distinguishable because anybody could file a civil motion, but in some ways that cuts against it because under the statute that was reviewed in that case, the Attorney General and the county attorneys could only file suit if an administrative complaint was brought and then sustained. And they had

argued, well, no, now it's completely speculative whether that's even going to happen and, therefore, whether we'll even be in a position to sue them.

Whereas, in this law it's within the four corners of the statute. There's no exceptions for parody in the statute and so they can sue it. So it's a stronger case from the perspective of standing than *281 Care Committee* was. And it's also -- so the only -- the only distinction on the merits is the idea that deepfakes are somehow singularly different and that only comes entirely from the Hancock declaration.

And I don't think that the untimely amendment ought to be allowed even to consider a version of the declaration without the hallucinated citations. There wasn't any cause that it couldn't have been caught prior to filing and it's, you know, three weeks out of time and it has disrupted this.

The other thing is that the declaration of Hancock, not only does it talk about how he composed the declaration using ChatGPT, but he also does it from memory and there's no reason for that. They should have been able to file the actual logs that he submitted to ChatGPT and that would demonstrate exactly how much that declaration is composed by an Artificial Intelligence algorithm versus being extensively edited by Hancock but extensively edited

in such a way that it never caught -- he never caught the hallucinated citations.

One other thing I wanted to -- I want to address, and it's a little bit preemptive because I'm not sure if I'll have a reply is -- will I have a reply?

THE COURT:  As to?

MR. BEDNARZ:  After the defendants.

THE COURT:  Oh, yes.

MR. BEDNARZ:  Okay.

THE COURT:  Yes, you will.

MR. BEDNARZ:  In that case, I think that's all. Thank you.

THE COURT:  Okay.  Thank you for your argument.

I'll hear from both defendants, counsel.  I don't know if Mr. Farrell wants to start or Ms. Nierengarten?

MR. FARRELL:  I think you're stuck with me first, Your Honor.

THE COURT:  All right.  Well, you heard -- you can respond to any of the conversations I was having with Mr. Bednarz and then I'm sure I'll have some additional questions for you as well.

MR. FARRELL:  Thank you, Your Honor.

The Court should deny preliminary injunctive relief for three main reasons and these reasons I think will all pick up on some of the conversation that you were just

having with counsel for the plaintiffs.

First, the plaintiffs lack standing.  Second, even if the plaintiffs have standing, they haven't met their First Amendment facial challenge burden as set out by the Supreme Court in *Moody*.  And, finally, the plaintiffs have not shown irreparable harm because they waited so long to sue, which I do think is a serious barrier to injunctive, preliminary injunctive relief at this stage.

Let me start first with standing.  And in the spirit of my presentation this morning so far I'm going to start with another acknowledgement, which is that in the First Amendment pre-enforcement context the standing inquiry is somewhat relaxed as opposed to other types of facial constitutional challenges.

That said, the inquiry is not meaningless.  The plaintiffs still need to show that their planned conduct is arguably prescribed by the challenge statute and they also have to show a credible threat of enforcement and they can't make either showing here.

With respect to planned conduct.  As we extensively walk through in the brief, the plain text of the challenge statute does not cover parody because it only applies to deepfakes that are so realistic that a reasonable person would essentially believe them to, you know, basically believe them to be real.  Indeed, Plaintiff

Franson herself avers that that is how she understood the law to exclude parody as written. That element of the statute was in place when she originally voted for it in 2023.

And even if the Court thinks that is ambiguous, right, that it's a close call or there's some interpretive question, I really recommend that the Court look at how the Eighth Circuit structured the standing analysis in the *Christian Action League* case from 2022. That's a case where basically antipornography advocates challenged a Minnesota harassment statute. And what the Eighth Circuit said is the first thing we have to do is figure out whether the planned conduct is covered by the statute, because if it's not, no harm, no foul.

And that's the situation we had here. The Eighth Circuit said there even though the statute was ambiguous, a narrowing construction to avoid any constitutional problems was appropriate. And in that case the statute had even been enforced against the plaintiff before and the Eighth Circuit said, still, no, we look at the text of the law and what the text of the law does is bring this content, this conduct, outside the scope of the statute.

And that is what we have here.

THE COURT: Well, it strikes me you have the stronger case against Mr. Kohls's postings that are

explicitly disclaiming that these are parody and using, you know, AI-generated content.

But, I guess, help me understand how Representative Franson's reposting of those without those disclaimers, you know, fits within, especially when people like Senator Klobuchar and Gavin Newsom found those to be realistic.

MR. FARRELL:  The case against Plaintiff Kohls and his lack of standing is strong.  I think the case against Franson standing is equally strong.  And the reason is this, Your Honor.

Plaintiff Franson wants to continue to post AI-generated parodies.  That's what she alleges in the complaint.  And that type of content is just not covered by the statute.  But even if the Court thinks that's ambiguous with the Franson, then I think what's fatal to her standing is the lack of any credible threat of enforcement.  Either for anything she's posted in the past or for any future speech because what a plaintiff has to allege in this First Amendment pre-enforcement context is basically chill.  And what's unique about this case is that the plaintiffs are not dissuaded in any way by the existence of this statute.  They continue to post the AI-generated parodies that they believe they should be entitled to post.  And we compiled an extensive body of evidence of social media posts that

postdate the enactment of the 2024 law that are plainly parody. And without any chill and without any thread of enforcement for past conduct, that's fatal to Franson's standing.

THE COURT: So even if her conduct is arguably prescribed within the statute because she's continuing to post, that takes her out of?

MR. FARRELL: Yes. We think that's the appropriate mode of analysis. And one case that I think underscores that -- or a couple cases, the *Yellen*, *Missouri versus Yellen* in the *School of the Ozarks* case.

In the *School of the Ozarks* case, in particular the Eighth Circuit talked about how there the christian college that was challenging the statute at issue, if I'm recalling correctly, basically was saying that they were not going to be dissuaded in any way by the existence of the statute and that belied their claim of self-censorship or any chill.

So we think even if you thought that Franson's conduct is arguably prescribed by the statute, the lack of any credible threat of enforcement is fatal to her standing.

Unless there are any questions on standing, I'm going to move to the merits.

THE COURT: That sounds good.

MR. FARRELL: So in terms of the merits, we think

here are the big problems with the plaintiffs' case.

The first is their burden under *Moody*.  Just this past term the Supreme Court emphasized that even in the First Amendment context facial challenges are hard to win and the decision to pursue a facial challenge comes at a cost.  And the Supreme Court laid out a three-part test that a plaintiff has to meet to show that a law should be facially invalidated.  And that test requires the Court to assess the law of scope and then decide which applications of the law violate the First Amendment and then weigh them.

The Eighth Circuit recently vacated an injunction for failure to follow *Moody*.  That's the *GLBT Youth* case from August of 2024 that we cite in our brief.  And the fundamental problem for the plaintiffs here is that they just ignore *Moody* entirely.  Their opening brief I don't even believe cites it.  They don't explain how *Moody* is satisfied.  And that standing alone is a sufficient basis to deny injunctive relief, just for failure to meet their burden under the operative framework.

But even if the Court thinks that, you know, *Moody's* in play or they've done enough to sort of implicate *Moody*, we think that the core problem with the plaintiffs' case is that while it is true that false speech is not categorically unprotected, false speech that causes certain kinds of legally cognizable harms can be regulated,

consistent with the First Amendment.  And there are two legally cognizable harms at issue here.

If the false speech -- if the false deepfake, essentially, is inseminated with the intent to injure the candidate then that is effectively defamatory speech.  And to the extent there's any gap there, the Court can interpret the statute narrowly to close that gap.  That's what the Minnesota Supreme Court did in the *State v. Crowley* case, which is cited in our brief.

To the extent that the deceptive deepfake is disseminated with the intent to more generally influence the election, then that works a real harm to voter rights.  And that is a legally cognizable harm that spans a number of diverse contexts.  So there are certainly those cases where Courts are talking about interfering with the mechanics of voting but there are also cases where the principle is broader, such as interfering with shareholder voting because, you know, some sort of SEC document provides shareholders with false and misleading information.  That is the type of legally cognizable harm that the Supreme Court had in mind that brings this false speech outside of the scope of --

THE COURT:  But isn't all political speech intended to influence?  That's where I think, like, where is the end point on that?  It seems like there's got to be some

protected speech within injury.  I acknowledge defamation, that that's a different beast, but influence seems fairly broad and I'm worried about what the contours of that are.

MR. FARRELL:  A few responses to that, Your Honor.

We think there are built-in guardrails in the statute to address your concern that it's overly broad.

One is the requirement that the deepfake be knowingly or basically be disseminated with what amounts to actual malice.  And we do think that specific intent requirement that it be that the deepfake be disseminated with the intent to influence an election does filter out or target the speech that would be prescribed by the statute and we also think that the limited time in which it applies all serve to protect or narrow the scope of the statute from capturing a protected speech.

But to the extent that the statute would sweep up any protected speech, then we do think that the relevant level of scrutiny is satisfied.

And let me just say a couple of things about the relevant level of scrutiny.

You know, I think the real friction in this case is whether *281 Care Committee* is controlling or whether there is a way to distinguish it.  What we believe is distinguishable about *281 Care Committee* is that case really -- that was a statute that was basically dealing with, like,

false ballot speech.  The type of speech, false speech, that's being regulated here is fundamentally different.  It has to do with this deceptive technology that works those unique legally cognizable harms that we were just talking about.  And we think that makes this statute more akin to what Justice Breyer was talking about in his concurring opinion in *Alvarez*.  Statutes that prohibit perjury or impersonation of government officials.  Basically those statutes that cause a subset of specific harms where the State is able to step in and regulate without offending the First Amendment.  So that's just a point on the level of scrutiny.

But even if the Court disagrees with me on that and strict scrutiny applies, we do think there's a compelling interest in electoral integrity and in terms of narrow tailoring.  No statute advances the State's unique interest in combatting this type of false speech as effectively as this statute.  Deepfakes do pose unique harms, they proliferate rapidly and they are difficult to counter, particularly in the weaning days of election.  That's not just Professor Hancock that says that.  If you take Professor Hancock out of the equation, that is also in Professor West's declaration where he talks about specific examples where deepfakes have been disseminated in the context of an election and have had an impact and he also

talks about why traditional interventions to combat them are difficult. So the type of false speech that's being regulated speech here is different from *281 Care Committee*.

The other salient feature that brings this out from under *281 Care Committee* is something that counsel for the plaintiffs alluded to, which is this idea that in the *281 Care Committee* context anyone could go to the State's Office of Administrative Hearings and file a complaint. There is an administrative process and there was a robust enforcement history. There had been a bunch of these complaints filed. And here that's just not in play. There's not that administrative process. The universe of potential enforcers is narrower. It's public officials or those who are directly impacted by the deepfake.

THE COURT: And I acknowledge there were some efforts to narrowly tailor, but what about some kind of disclosure requirement? Could there have been and was that contemplated? Would that survive this level of strict scrutiny? Something like what Mr. Kohls was doing, putting parody in capital letters or some disclaimer that this was, you know, AI-generated content?

MR. FARRELL: You know, I think if the legislature had considered a disclosure requirement, that might satisfy the State's interest, but I think the interest would be slightly different. That would be, I think, regulating the

speech in terms of more at the creation stage.

Here the legislature was really focused with the impact of the speech and we think this is -- the legislature's decision to focus on that speech, that speech that the legislature thought worked that type of unique harm, is the type of reasonable legislative judgment that the Court would and should typically defer to.

I want to say just a few things about irreparable harm, if I may?

THE COURT: Yes.

MR. FARRELL: It's sufficient to deny injunctive relief just because the plaintiffs haven't shown reasonable diligence and I do think that the facts here are unique.

So with respect to Franson, nearly all of the elements of the law that she challenges were in place in 2023. They didn't bring this challenge until September 2024. That's fatal to any showing of irreparable harm.

I don't think Plaintiff Franson having voted for the original law can credibly say that she's unaware of the contents of the law, particularly because other portions of the complaint explain in detail that she voted for this law because she liked other parts of the law and presumably she wasn't voting for an unconstitutional law given the oath of office that she takes.

With respect to Plaintiff Kohls. What I think is

most salient is to contrast how the plaintiffs approached the litigation in California versus the litigation here.  So a couple differences.

First of all, Minnesota's law, nearly all of the elements they're challenging, certainly with respect to Kohls that would have an impact on him were in place in 2023, so we've got a large gap.  Big lead time.

Contrast that with California.  They challenged that law the day it went into effect.  --

THE COURT:  I was going to ask you, are there any examples where, like, a 16-month delay has been found to still meet the irreparable harm timeframe?

MR. FARRELL:  I don't know specifically, Your Honor.

THE COURT:  Okay.

MR. FARRELL:  Off the top of my head we cite some cases in our brief about sort of similar time periods where a lengthy delay has been found.

Let me rephrase that.  We cite cases in our brief where a lengthy delay has been found sufficient standing alone to deny --

THE COURT:  Okay.

MR. FARRELL:  -- injunctive relief or has factored into the analysis.  Because the Court does have to, you know, certainly the merits are important in any First

Amendment case.  But the Court does have to consider all the *Dataphase* factors when it's assessing whether, you know, the extraordinary remedy of a preliminary injunction is appropriate and so --

THE COURT:  You were addressing Mr. Kohls in California?

MR. FARRELL:  Yes.  Oh, and just the contrast with the timing in California versus here, you know, Minnesota's law went into effect in -- I believe in -- and, you know, it was signed into law May of 2023 but the challenge isn't brought until September of 2024.  But with respect to the challenge that the plaintiffs brought in California, they sued the very day that the amended law that the California legislature put into effect when that law went into effect.

So just, you know, there they were -- they were prompt.  They were diligent.  That is not the case here.

And, you know, to the extent that this case is going to continue and they have alleged enough for standing, which we don't think they have, then, you know, we will litigate the merits.

But in terms of an injunction, we don't think they've shown irreparable harm.

THE COURT:  I haven't dug very deeply into the California case.  A preliminary injunction was granted but I don't believe standing was raised.

Do you have any information as to just the posture of the litigation in that case and why it's differing from what is here in Minnesota?

MR. FARRELL:  Sure.  So a few responses on the California case and why I don't think it should dissuade you from denying injunctive relief here.

I don't know specifically if standing was raised. It's not discussed in the decision by the district court judge.  I think part of the reason is that there that Gavin Newsom said that, like, they were enacting that law to outlaw stuff that Christopher Kohls was posting.  That's just not the case here, you know, that Minnesota's law was well into effect before the July 26th video was ever -- came into existence.  So that's one key distinguishing feature on standing that I just don't think was implicated.

And with respect to the actual merits of the analysis, there are differences between California law and the Minnesota law that California law does talk more broadly about materially deceptive content.  Our Minnesota law and what the legislature was really concerned about was the unique harms that are tied to deepfakes.

And, finally, the last thing I'd say is we just don't think that the judge in California, with all due respect, really grappled with *Moody* and how that framework applies.

So for those reasons, we don't think it's persuasive here.

THE COURT: Okay. As to the delay, I'm troubled by the 16 months.

Is there any difference and is it a shorter delay in light of the amendments to the statute in 2024?

MR. FARRELL: I don't think in any relevant way, Your Honor, because nearly all the elements of the statute that they're challenging were in place in 2023. I mean, the core, the heart of this challenge is this idea that this law covers parody because of the way deepfake is defined. And that was true in 2023 and it's true -- and it was true 16 months later.

And that delta I do think is a unique fact that makes the irreparable harm showing very difficult for the plaintiffs here and a reason, a sufficient basis, to deny injunctive relief.

THE COURT: Mr. Farrell, anything else?

MR. FARRELL: Nothing further, Your Honor.

THE COURT: Thank you.

Ms. Nierengarten, we've had a lot of argument but I want to hear on behalf of the county attorney, Mr. Larson.

MS. NIERENGARTEN: Thank you, and good morning.

THE COURT: Good morning.

MS. NIERENGARTEN: So obviously the Court has a

lot to consider on the motions before it and I don't intend to take much of the Court's time this morning.  You know, by all accounts Defendant Larson is an afterthought in this case.  I don't think his name has been uttered once except by you and now by me.

And, you know, the plaintiffs haven't said anything substantive about Defendant Larson in their briefing, in their complaint, in their arguments today.  They don't allege that he's taken any enforcement action against the plaintiffs in this case, just that he could.

But indeed Defendant Larson --

THE COURT:  But in light of that it's fair that he'd be a defendant, right, that he could, because that's where Representative Franson lives?

MS. NIERENGARTEN:  You know, there's nothing in the law that limits the County Attorney who could bring enforcement action to the County Attorney who is seated in the county where the speaker lives.  There is nothing that stops the other 86 county attorneys in the State of Minnesota from bringing a claim against Plaintiff Franson in this case or Plaintiff Kohls for that matter.  There's simply nothing that limits the jurisdiction to a particular county attorney.

THE COURT:  Okay.

MS. NIERENGARTEN:  And I think it's worthwhile to

note too that, yes, Plaintiff Franson lives in Douglas County but she represents a district that covers three counties or that is situated in three counties.

So, again, this, you know, he's one of three county attorneys who is even relevant in that, in her race, for instance.

But indeed, you know, specific to Defendant Larson, he's testified in his declaration that he hasn't enforced this statute. That he doesn't intend to enforce this statute. That he's not looking into any issues related to compliance with this statute. It's just a nonissue for him.

So, you know, there was a --

THE COURT: So I took his declaration not to foreclose at least bringing, you know, any kind of criminal claim in relation to the speech that's already been made. But I guess I wasn't taking it to be prospective.

Is that what he intended by the declaration?

MS. NIERENGARTEN: You know, his declaration isn't necessarily prospective.

THE COURT: Okay.

MS. NIERENGARTEN: I mean, I think that any law enforcement agent of the, you know, or county attorney, a law enforcement officer, is not going to completely disclaim an entirely new law and say I would never ever under any

circumstances enforce that. I think, you know, this is a new law to him. It's a law that he has -- you know, obviously he's familiar with and certainly now because he's being sued over it, but it's not one that he's had to grapple with at this point.

You know, and I'm -- you honed in on a couple of components of the *Dataphase* factors and I just want to touch on those briefly as it relates specifically to Defendant Larson.

For the, you know, for the purpose of a preliminary injunction motion of course the Court looks at whether the First Amendment issue, interest at issue, is currently being threatened or impaired in some way.

So we, again, we have this declaration from Defendant Larson saying, I'm not threatening your First Amendment interest. I have no interest in enforcing or no intention of enforcing this law right now. And that would go to their past speech. And I think that was the only illusion to the county attorneys that was even brought up in this case is that they could still enforce for this past speech, but Defendant Larson is on record saying I have no intention of doing that.

Even if the mere existence of this statute were enough to, you know, be said to impair or threaten their speech, we're outside of the -- you know, the statute itself

has a limited window of time when it applies and we're outside that window. So I think that puts a finer point on, yes, there's a 16-month delay but there's also a time limitation in the statute itself and we're not in there right now.

So because we assess that factor based on present circumstances at the time that this preliminary injunction is sought right now, there's no threat of irreparable harm here, that is, that stems from Defendant Larson sufficient to support this motion.

THE COURT: But isn't Representative Franson's concern at least that the statute would allow for a political opponent to bring a civil suit or other claim?

MS. NIERENGARTEN: It may be, but she's not -- but there's not a political opponent who is a defendant in this case.

THE COURT: Okay.

MS. NIERENGARTEN: You know, Defendant Larson is not a political opponent of anyone. I mean, I guess when he runs for election he theoretically could be, but that's not why he's in this case, as far as we know.

THE COURT: That's fair.

MS. NIERENGARTEN: Of course, we don't really know why he's in this case. Plaintiffs haven't spoken to that issue.

You know, and I want to put a little bit of a finer point on this too. You know, even though Defendant Larson isn't actively seeking to enforce this statute and doesn't have any independent stands on the constitutionality of the statute, now we're relying on the State to defend the constitutionality, he has good reason to oppose this preliminary injunction motion and the claims against him. You know, these are constitutional claims that plaintiffs are asserting and, you know, they're seeking not just declaratory and injunctive relief but they're also seeking damages against Defendant Larson and costs and fees.

So, you know, the complaint itself in this case is 50 pages long. It has extensive, you know, a deep dive into the legislative history. The attorney's fees in this case, you know, could be extraordinary and that has a very real financial implication for Defendant Larson and for his, you know, Douglas County employer. And they don't want to be stuck, you know, for, you know, excuse the colloquialism, but holding the bag for a state statute that they haven't engaged with in this -- you know, in any way that relates to this case.

So that brings me to the other *Dataphase* factor that the Court has been focused on today, which is the likelihood of success on the merits.

And in this case, you know, we need to look at the

likelihood of success on the merits against this defendant, Defendant Larson. So even if the Court isn't persuaded about -- by the, you know, State's arguments on the constitutionality, plaintiffs still haven't demonstrated that they're likely to prevail against Defendant Larson.

Now, as, you know, when you called the case earlier you noted this is a case against Defendant Larson in his official capacity as the Douglas County Attorney. Well, official capacity cases are another way of pleading an action against the official's employer. In this case that's Douglas County. And that's, and we talk about this in our brief, but that's consistent with plaintiffs' actions here too, you know, they served the County Auditor. That's how you effect service on a county. They seek damages from Defendant Larson but they don't from the Attorney General because the Attorney General has Eleventh Amendment immunity that bars damages actions against him but that doesn't extend to county officials or their county employers.

So, you know, indeed this case is effectively against Douglas County by stating that official capacity claim. And to prevail on that official capacity claim, plaintiffs have to show that the County caused the constitutional violation at issue.

Now, under the *Monell* line of cases, the question is whether there's a direct causal link between a County

policy or a custom and the alleged constitutional deprivation here.  So they must -- they have to establish that link to prevail on an official capacity 1983 claim against local government.

Now, we have a lot of analysis in our brief about why this -- why state law can't be computed --

THE COURT:  I was going to say I thought your memorandum spelled it out --

MS. NIERENGARTEN:  Yeah.

THE COURT:  -- well, so.

MS. NIERENGARTEN:  And I don't need to go into that today.  And you, you know, Your Honor, the Court doesn't necessarily need to get into that either because plaintiffs don't.  Plaintiffs don't touch it.  All they do is they say in a footnote, again as an afterthought, that Defendant Franson -- or that Defendant Larson is even a party here.  On page 16 they say, "Larson spills ink arguing that plaintiffs cannot bring *Monell* claims.  Plaintiffs have not."

So plaintiffs are conceding that they haven't satisfied *Monell*, but they don't argue that they get to bypass *Monell.*  They don't provide any argument about how it is that they get to sustain this official capacity claim against Defendant Larson and his county employer at all.

So, you know, in contrast to us spilling ink on

how, you know, plaintiffs can't prevail in their claim against Defendant Larson, plaintiffs haven't allotted any ink to that issue. They haven't -- they haven't demonstrated at all that they can prevail against this particular defendant in this case.

Now, they -- conceivably they try to lump us in, Larson and with the Attorney General, and claim that, you know -- or I guess they don't provide any explanation or analysis of how we or why we would be lumped in. But lumping us in isn't enough to prevail on the, you know, end merits of their claims against Defendant Larson. And so it falls far short here on a preliminary injunction motion. You know, they're not the same parties.

And, again, you know, the facts demonstrate that. They served the County Auditor. They state these damages claims. There are these distinctions that show they are not part and parcel of the same party. They are two distinct government entities with different laws that apply or different laws that control how plaintiff can prevail on their claims against them.

Because plaintiffs haven't satisfied *Monell* or argued, even argued, that *Monell* doesn't apply, they've done nothing to show that they're likely to prevail against Defendant Larson on the merits of their claims.

And because they haven't established that

*Dataphase* factor or met the other *Dataphase* factors as it relates to their motion against Defendant Larson, Defendant Larson respectfully requests that you deny the preliminary injunction.

THE COURT:  All right.  Thank you for your argument.

MS. NIERENGARTEN:  Thank you.

THE COURT:  Mr. Bednarz, as I said, you'd have an opportunity to address the Court again, so now is your chance.

MR. BEDNARZ:  Thank you very much, Your Honor.

I just wanted to quickly address Defendant Larson's arguments first we don't claim to satisfy *Monell*. One moment.

(Pause in proceedings)

MR. BEDNARZ:  Because we didn't bring a *Monell* action.  Our complaint is captioned "Larson in his official capacity."  We are suing in his official capacity under *Ex Parte Young* doctrine, not *Monell*.

The complaint at the end says "nominal damages", Your Honor.  If we can't seek a dollar damage, that's fine. Otherwise we still have a challenge under *Ex Parte Young*.

So, that's all I want to say about *Monell*.

As for the claim that County Attorney Larson would not enforce for past conduct.  I think my colleague said it

correctly when his declaration -- characterizing his declaration says he would not pursue a complaint right now. The entire gist of their brief is that it would be unfair to treat County Attorney Larson different from his 86 colleagues and his declaration does not say he wouldn't investigate past conduct. He just says he's not investigating one right now.

So there isn't the kind of assurance that would rob Attorney Larson of standing. And the same, of course, is also true for Defendant Ellison.

Moving to his standing arguments. I also -- I want to address that Attorney Ellison said, "Franson admits she didn't think it covers parody." Your Honor, that -- if I said something to that effect, I apologize. The complaint just says she doesn't realize that it covered her very prolific posting of memes online.

But the delay is actually not significant because the statute only runs before elections and in 2023 there weren't elections. There certainly weren't elections that would be relevant to attorney -- excuse me, to Plaintiff Kohls. He didn't, you know, make videos about school boards or anything like that.

THE COURT: But she could have brought a reinforcement challenge at any time, though, right? I recognize that the scope is 90 days before an election but

she certainly could have brought this --

MR. BEDNARZ:  Well, she would have had to have conduct that would have fallen within the statute.  And the first example that we're aware of is the video that she had re-Tweeted on July, I think, 28, of the July 27th video that Plaintiff Kohls posted.  And so prior to actually having conduct that would reasonably fall within the statute, she probably wouldn't have had standing at all.

So the benchmark for her and for Plaintiff Kohls is really just going back to July about the same time that the amended law went into effect, so it's not a very significant delay.

Also standing.  Standing is not very difficult to meet in the First Amendment context and this was shown in *281 Care Committee* itself.  That involved a statute that had actually been on the books for close to a century but it had been amended four years before the statute -- before the suit was filed, which the Court found did give standing.  It made it so that it was a live issue that could plausibly be enforcement.

As for the enforcement history under that statute.  While anybody could have filed an administrative complaint, only the Attorney General or one of the County's attorneys could file a criminal complaint after a charge had been sustained.  And so arguably in that case it's actually a

sketchier standing question because at that time those attorneys did not have the ability to bring a claim until and unless a complaint had been sustained.

As for the chill. Your Honor, our clients are iconoclasts. They like to post stuff online. They attract news coverage of people that are upset about the things that they've posted online. But that's not the benchmark for chill. It's not a subjective test. It's an objective test.

And *281 Care Committee* is also an example of that. Because in that case the district court had found that declarations were incredible that the plaintiffs had said that they were chilled based on the prospective of enforcement. But whether they are or not was not that the -- not the question. The Eighth Circuit found it's an objective question whether people, reasonable people, would be chilled. And under that standard if you have less iconoclastic individuals than our clients I think that people would be chilled. In fact, there's a line in the complaint that where Plaintiff Franson reported that she had heard from colleagues that they were tamping down on social media because of awareness of how the law applies.

*Moody*. So *Moody* was briefed in California extensively. It only has a little bit of discussion in the district court's order, but there's a few things that distinguish *Moody*.

And the first is that that's a case that involved only content discrimination, not viewpoint discrimination, which we argue is the standard here.  The law -- this is -- this is brief.  They argued that it's not really viewpoint discrimination because it applies to positive or negative speech but the fact is that it depends on whether it's authorized.  Whether it has the approval --

THE COURT:  Consent.

MR. BEDNARZ:  -- of a party.  And that's a proxy for it.  That's a proxy for a speech that is supportive of a candidate who likes the deepfake.  Who likes a deepfake of them being shown in a union hall where everyone's super happy and a deepfake of them doing great things in the community or something like that.

That is a viewpoint discrimination.  It's barring deepfakes that are created by others.

THE COURT:  But that wouldn't be encompassed within the statute, right?  If you have the consent of the party to post this, that's outside the statute.

MR. BEDNARZ:  Well, the statute only applies to deepfakes without the assent of the party.

And so a candidate that wants to make deepfakes of them doing great things or being greeted by, you know, happy crowds or, you know, visiting orphans in the hospital or something, they can do that.

THE COURT: But that doesn't seem to be the harm the State's concerned about.

MR. BEDNARZ: Right. I mean, the harm the State raised is -- and he did it -- my colleague did it expressly, is the analogy to defamation.

But that analogy doesn't hold up because in their brief and -- on page 33, when arguing that existing or potential remedies are inadequate it says that a deepfake portrayal may not harm the deepfake person's reputation, yet still influence an election. Because the harm is not tailored to anything that's like defamation.

The State interest, the one that actually applies, is for some amorphous idea of election integrity.

THE COURT: Mm-hmm.

MR. BEDNARZ: And it's distinct from the cases when we're talking about access, to ballots, to polling locations, to tricking people against exercising their right to vote. The harm here is free and fair elections and the idea that people would be misled. And this is exactly the same -- exactly the same harms that were alleged in *281 Committee* and didn't succeed.

So continuing a little bit on to *Moody*. The distinction we argue *Moody* only applies to viewpoint discrimination. I agree with my colleague that the district court in California didn't make very much discussion about

it but this was something that the State certainly brought up and implicitly they think the Court would have found that we were right that it was, in fact, viewpoint discrimination and not merely content discrimination and, therefore, strict scrutiny applies. But we also contend that we would meet the *Moody* standard anyways.

*Moody* talks about the burden of bringing a facial challenge, that comes with a cost. And the problem in that case is they were talking about very complicated regimes that have been imposed by Florida and Texas that required social media companies to do all sorts of different things. And it was not really clear how they would shake out and whether the platforms' actual speech rights would be implicated or the speech rights of the users of the platform.

This is a lot different than that. This is a statute that has four corners and it says it's criminal. So in this case, the as applied challenge, it doesn't come with nearly as much of cost because it's black and white.

I'm just checking my notes, Your Honor.

THE COURT: No problem.

MR. BEDNARZ: On the issue of the self-inflicted injury for Plaintiff Franson. This was a packaged deal and it was an extremely popular package deal. There was only a single legislator in either chamber that voted against it

and when I actually watched all of the videos, he voted against it because he thought that the penalties for deepfake porn were not harsh enough.  But when this was amended this year, it turns out that a large part of the chamber had very strong concerns about the constitutionality as applied to political deepfakes.

When you're voting on a bill in the final hours of a legislative session and you can't amend it, it's too late, it's a must pass and you need to tell your constituents, did I stand up against pornography that's targeting teenagers or did I vote against it because I had concerns about some other detailed provision, it's very hard for anybody, especially for somebody like Plaintiff Franson who has her own concerns about deepfake porn being targeted at women, to say, well, no, I had to turn it down, maybe we'll fix it again some later date.  It's a packaged deal.  It doesn't imply that she supported the sandwiched provision about --

THE COURT:  I mean, she voted against the amendments here but did she make any statement?

MR. BEDNARZ:  Your Honor, she didn't speak --

THE COURT:  Okay.

MR. BEDNARZ:  -- at any of the hearings.

And so, I'll just as a final remark.  Election misinformation is not a legally cognizable harm.  It's not defrauding people of votes.  It's not preventing people from

voting.  It's not defamation.  It's just the same kind of speech of persuading people into or out of voting, which has always been regarded as a core First Amendment right and that's why we are likely to succeed on the merits.  Thank you.

THE COURT:  I would like to thank both parties for the good briefing and for the argument today.  I will work hard to get an order out in the near future.  So thank you.

(Court adjourned at 11:26 a.m.)

*          *          *

**REPORTER'S CERTIFICATE**

I certify the foregoing pages of typewritten material constitute a full, true and correct transcript of my original stenograph notes, as they purport to contain, of the proceedings reported by me at the time and place hereinbefore mentioned.

/s/Lynne M. Krenz
Lynne M. Krenz, RMR, CRR, CRC